HARRY E. MILTON v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

In Banc, January 24, 1906.

1. **PRINCIPAL AND AGENT: Torts: Scope of Employment: False Imprisonment.** The employment by a railroad company of a private detective to ascertain the facts connected with a train robbery, to find out who committed the robbery, and to report, does not confer upon the detective or any of his agents authority to arrest a person supposed to have been connected with the crime, nor is such arrest within the scope of the detective's employment.

2. ———: ———: ———: ———: **To. Ascertain Facts: Trespass.** The employment of a private detective to ascertain a fact and to report the result thereof, does not contemplate within its scope the right to arrest or to commit any trespass upon any person whomsoever.

3. ———: ———: ———: ———: **Facts in Judgment: Knowledge of Habit of Promoting Arrest: Matter for Jury: Hiding Behind Words of Contract.** The defendant's superintendent sent for the president of a secret service agency, a corporation, and said: "I suppose you have read and heard about this train robbery near Kansas City; I want you to go up there and find out who committed this robbery and report." The agency's president testified that the superintendent said "a train had been held up the night before" and that he wished that "I should go up there and ascertain the facts pertaining to the robbery, if I could, as to who the parties were that held up the train." The president of the detective agency sent an employee

Milton v. Railroad.

to the scene, and he was present when the plaintiff, at the suggestion of the prosecuting attorney, was arrested by the local police, but took no part in the arrest, but went with the policeman to plaintiff's room to obtain identifying articles of clothing, and was at the jail when persons came to identify plaintiff, who, after being confined for four days, was discharged, and sues for false imprisonment. *Held*, that, although a grievous wrong was done plaintiff, the defendant was not liable therefor, because the employment of the detective to ascertain the facts as to who participated in the robbery did not contemplate within its scope the right or duty of the detective to cause the arrest of any one who he might suspect had been concerned therein. However, if it had been shown at the trial that defendant knew that the detective agency was in the habit of unlawfully arresting persons for the purpose of extorting confessions from them, or for the purpose of subjecting them to scrutiny by other persons who might be able to identify them, the defendant would have been liable for any false arrest or imprisonment by such detective.

*Held*, by Valliant, J., dissenting, that the master's liability for the wrongful act of his servant does not depend on the words in which the contract of employment is expressed, but, generally, if the agent in his effort to accomplish the act he was employed to do, negligently or willfully injures another, it is, in legal theory, the hand of the master that does the wrong. The master, having chosen his own servant, is responsible to others for that servant's lack of capacity, or lack of care, or lack of regard for the rights of others, when that servant is doing his master's work; and whether the wrongful act committed in this case by the detective was or was not to have been reasonably contemplated by defendant was a question of fact for the jury. *Held*, also, that there was no necessity or pertinency for the defendant, in employing the detectives and sending them out, to give them orders to make no arrests, if making or promoting arrests was not in the detectives' line of business and was not in contemplation when they were employed. *Held*, also, that to permit the master to employ a detective possessing the power and the means of inflicting wrong usually possessed by detectives, and to hide his liability behind the innocent form of expression used when he is employed, would be to make out an easy method for doing wrong without incurring liability.

Appeal from Clay Circuit Court.—*Hon. E. J. Broad-dus*, Judge.

REVERSED.

*Elijah Robinson* for appellant.

(1)  Neither Furlong nor any one acting under him had any authority to make arrests or cause arrests to be made; and the defendant's demurrer to the evidence should therefore have been sustained.    Fire Ass'n v. Fleming, 78 Ga. 734; Pinkerton v. Gilbert, 22 Ill. App. 568; Railroad v. Epperson, 26 Ill. App. 79; Travis v. Ins. Co., 86 Mich. 288; Flora v. Russell, 136 Ind. 153; Stevenson v. Railroad, 93 Cal. 558; Stone v. Hills, 45 Conn. 44; Railroad v. Douglass, 69 Miss. 723; Ritchie v. Waller, 63 Conn. 158; Merritt v. Hepenstal, 25 Can. S. C. 150; Smith v. Railroad, 78 Hun 524; Georgia R. & B. Co. v. Wood, 94 Ga. 124; Marli v. Lord, 39 N. Y. 381; Railroad v. Harrison, 48 Miss. 112; Gilliam v. Railroad, 70 Ala. 268; Flower v. Railroad, 68 Pa. 210; Graham v. Railroad, 47 La. Ann. 1656; Dyer v. Rieley, 28 La. Ann. 6; Walton v. Car. Co., 139 Mass. 556; Ryan v. Railroad, 1 Jones & S. 139; Wilpse v. Bridge Co., 63 Mich. 639; Baker v. Kinsey, 38 Cal. 631;   Keating v. Railroad, 97 Mich. 154; Golden v. Newbrand, 52 Ia. 59; Goodloe v. Railroad, 107 Ala. 233; McCauley v. F. & C. Co., 38 N. Y. 773; Smith v. Spitz, 156 Mass. 319; Marsh v. S. C. Co., 56 Ga. 274; Mulligan v. Railroad, 129 N. Y. 506; McKenzie v. McLeod, 10 Bing. 385; Goodman v. Kennell, 3 Car. & P. 167; Porter v. Railroad, 41 Ia. 358; Fairchild v. Railroad, 60 Miss. 931.   In order to render the master liable for the negligent or tortious act of his servant, the act of the servant must be done in the course of his employment.  It must pertain to the duties which he was employed to perform.  Jones v. Packet Co., 43 Mo. App. 398; Farber v. Railroad, 32 Mo. App. 378; McKeon v. Railroad, 42 Mo. 83; Snyder v. Railroad, 60 Mo. 419; Jackson v. Railroad, 87 Mo. 30; Walker v. Railroad, 121 Mo. 575; Burger v. Railroad, 123 Mo. 679.  The master himself has a right to determine, and assign to his servants their duties, and no assumption by a servant of duties not assigned  to him will

bring those duties in the course of his employment, as defined by the master. Sherman v. Railroad, 72 Mo. 62; Cunningham v. Railroad, 31 Upper Can. Q. B. 350; Railroad v. Keighron, 74 Pa. St. 316; Marion v. Railroad, 59 Ia. 428. (2) Defendant's superintendent employed Furlong to procure information as to the robbery and report the same to him. Furlong was engaged in an independent employment, and the defendant had no right or power to control his means or manner of accomplishing the result. In these matters he was entirely independent of the defendant, and it can not be held liable for any act of his or any act of anyone employed by him in the performance of the work. For this reason also the demurrer should have been sustained. Mechem on Agency, sec. 747; Burns v. McDonald, 57 Mo. App. 559.

*Frank P. Walsh*, *Wm. H. Wallace* and *T. B. Wallace* for respondent.

(1) Neither malice nor want of probable cause need be proven to support an action for false imprisonment. Arrest and imprisonment without process of law is the ground of the action. Boeger v. Langenberg, 97 Mo. 390; Ahern v. Collins, 39 Mo. 149. (2) Any person who is present at the commission of a trespass of this character, aiding, abetting, encouraging or countenancing the act is liable. Cooper v. Johnson, 81 Mo. 483; McMannus v. Lee, 43 Mo. 208; Carson v. De Sau, 142 N. Y. 445. (3) The Furlong Detective Agency was employed by the defendant railway company to find out who committed the robbery. They were instructed to come up to Kansas City to work on the case and report to the general manager of the Missouri Pacific Railway. The detective agency detailed Harbaugh for this work. In an attempt to accomplish the purpose for which he was employed—to discover who the robbers were—he had Milton imprisoned. This makes the company lia-

ble for his act, notwithstanding that he may have been instructed not to cause any arrests to be made. Garretzen v. Duenckel, 50 Mo. 104; Palmeri v. Railroad, 133 N. Y. 262; Wheeler & Wilson Co. v. Boyce, 36 Kas. 354; Cameron v. Express Co., 48 Mo. App. 99; Forbes v. Railroad, 116 Mo. 92; Story on Agency (9 Ed.), sec. 452; State ex inf. v. Ins. Co., 152 Mo. 38; Milton v. Railroad, 107 Mass. 108; Singer Mfg. Co. v. Rahn, 132 U. S. 518; Railroad v. Bayfield, 37 Mich; Hill v. Morey, 26 Vt. 178; Renick v. Bentley, 90 Wis. 457; Postal Tel. Co. v. Brantley, 107 Ala. 683; Fitzsimmons v. Railroad, 98 Mich. 257; Borden v. Felsh, 109 Mass. 154; McClung v. Dearborne, 134 Pa. St. 396; Railroad v. Kirk, 102 Ind. 399; Ochenheim v. Shapley, 85 N. Y. 217. Garretzen v. Duenckel, 50 Mo. 104, is the best case to be found in any of the books upon this question, and has been oftener and more generally cited than any other case on the subject, not only in this State, but in other States. In addition to being a model case to illustrate the principle, the opinion is unusually clear and contains an excellent review of the authorities. In that case the plaintiff was injured by the careless discharge of a gun in a gun store. The defendant's salesman had been instructed by defendant, the proprietor, not to load guns in the store, but at the request of a customer and in order to make a sale, he violated the instructions of his principal and loaded the gun, when it was discharged and the plaintiff injured. The principal was held liable. This case is precisely like the one before the court. The detective agency was employed to discover evidence as to the robbery, find out who committed the robbery. In order to accomplish this purpose they imprisoned Milton, and, as said by Judge Wagner, it makes no difference that private instructions were disobeyed. See, also, State ex inf. v. Ins. Co., 152 Mo. 38; Story on Agency (9 Ed.), sec. 452. (4) Something is said in the brief of the appellant about the detective agency exercising an independent employment. But this is not

the case where an independent contractor is engaged to perform and complete a specified piece of work for a total price, according to a specified plan, using his own means and material. The detective agency was distinctively an agent and not a contractor. Everything the agency did was done for the railroad company and not for itself. It was paid for the work done by it whether anything was discovered or not, the bills being made out and paid monthly. Nor is it true, as stated by the appellant, that the defendant had no control of the work the detective agency was employed to perform. Furlong, the superintendent of the agency, was instructed by Clark, the general superintendent of the railroad company, to report to him from time to time, and Furlong made reports both orally and by letter. The true test in these cases is the right of the employer to control the manner and means of doing the work. Mound City Paint Co. v. Conlon, 92 Mo. 229; Speed v. Railroad, 71 Mo. 303; Singer Mfg. Co. v. Rahn, 132 U. S. 523. The right of control on the part of the employer will make the person employed a servant or agent, even where he exercises an independent employment and undertakes to do the work by the job. Borg v. Bansfield, 65 Minn. 355; Tutrix v. Sellers, 39 La. Ann. 1011.

MARSHALL, J.—This is an action for false imprisonment. The plaintiff recovered a judgment for $10,000 in the circuit court of Clay county, and the defendant appealed.

The petition alleges that on the 4th of October, 1898, the defendant, acting through its agents and servants, and through certain detectives and officers from Missouri and Kansas, did without any warrant or other legal process, and without probable cause, falsely, wantonly, maliciously, illegally and unlawfully imprison plaintiff in a certain jail in the western part of Kansas City, Missouri; did keep him there for about four days and nights, and denied him access to his relatives and

friends and the benefit of counsel, for which the plaintiff claimed $15,000 compensatory damages and $15,000 punitive damages.

The answer is a general denial.

The case made is this:

On the 23rd of September, 1898, one of the defendant's passenger trains was held up and robbed near Leeds, in the southern part of Kansas City. A day or two afterwards H. G. Clark, the defendant's general superintendent, sent for Thomas Furlong, the president of the Furlong Secret Service Company, a corporation, engaged in the detective business, and when Furlong arrived Clark said to him: "I suppose you have read and heard about this train robbery up near Kansas City?" He said: "Yes, sir." Clark then said: "I want you to go up there and find out who committed this robbery and report."

Furlong states the matter in this way: "Mr. Clark said a train had been held up at Leeds the night before and that he wished that I would go up there and ascertain the facts pertaining to the robbery, if I could, as to who the parties were that held up the train."

The foregoing is all the evidence in the case as to the employment of Furlong by the defendant, and that evidence was adduced by the plaintiff; accordingly Furlong went to Kansas City, and had two of his employees, Dickson and Harbaugh, to go there also.

Prior to Furlong's reaching Kansas City, John Hays, the chief of the police department of that city, with his detectives force, had been investigating the matter, and had obtained information that convinced them that one Lowe was implicated therein, but they had been unable to locate him. After Harbaugh's arrival, he succeeded in finding him, and he was arrested by the police department of Kansas City, and Lowe confessed to having been interested in the hold-up, and stated the names of other persons who acted with him, and said that one of the parties told him that his friend

Harry (no surname is disclosed, and Lowe disclaimed knowledge of the same) would get the buggy in which they would ride to the place where the hold-up was to occur.

Furlong instructed Harbaugh to ascertain any facts and any information that he could that would lead to the discovery of the robbers, and to act in connection with Chief Hays, and to report to Chief Hays, and Chief Hays detailed Harbaugh to work with three of the Kansas City detectives, Sanderson, Bryant and Keshlear, on the matter.

Thereafter Harbaugh continued so to operate with the local detectives. There were other detectives representing the express company also working on the case. Furlong did not remain long in Kansas City. From information obtained by Hays, he concluded that the plaintiff was the person referred to as Harry, and accordingly reported to Mastin, the prosecuting attorney of the county, and he advised him to send over to Kansas City, Kansas, where the plaintiff was working as a switchman in the yards of the Chicago & Great Western Railway Company, and ask him to come over to Kansas City, Missouri, and if he refused, to ask for the assistance of the police department of Kansas City, Kansas, and have him, the plaintiff, locked up over there, and to send the persons who claimed to be able to identify "Harry" to see him.

Accordingly Harbaugh, Bryant, Keshlear and Sanderson went over to the said yards, and Sanderson, with the assistance of one Addison, who was connected with the police department of Kansas City, Kansas, arrested the plaintiff, and Sanderson took him to the Mulberry street police station in Kansas City.

Harbaugh, Sanderson and Addison testified that Harbaugh had nothing to do with the arrest or subsequent confinement; while on the other hand, other witnesses, who were present, testified that Harbaugh participated in the arrest. After Sanderson had taken the

plaintiff to Kansas City, Missouri, Harbaugh and Addison went to the house of the plaintiff's sister, Mrs. Hodgins, and without her consent, searched the room in the house where the plaintiff had been staying, and took a hat, a necktie, and a collar, being the property of the plaintiff, after she had refused to sell them to them for five dollars, and told her the plaintiff would not be home that night for they had him at the police station where they wanted him.

Furlong testified that his company had no authority to make arrests and no police power, and that he gave Harbaugh no instructions as to participating in the arrest of any person in this particular case, but that Harbaugh had general instructions not to participate in arrests.

While the plaintiff was in prison he was compelled to put on the hat, necktie and collar, aforesaid, and to submit to the inspection of various persons to see whether he could be identified as the "Harry" who got the buggy for the robbers. During those inspections Harbaugh was present and participated therein. None of the persons who had called to identify him were able to say that he was the "Harry" referred to. So after being held under arrest for four days and nights, the plaintiff was discharged and went back to work with the railroad aforesaid.

At the close of the whole case the defendant demurred to the evidence, the court overruled the demurrer, and the defendant excepted, and now assigns that ruling of the court as the chief error relied on.

I.

The chief contention of the defendant is that the plaintiff failed to make out a prima-facie case. The gist of the contention is that the employment of Furlong by the defendant's general superintendent conferred no authority upon Furlong or any of his agents to arrest the plaintiff or to participate in any such arrest, nor was

such an arrest within the scope of the employment of Furlong.

Reduced to its last analysis this case must be solved upon the determination of the proposition whether authority conferred by a principal upon an agent to ascertain facts and to report to the principal makes the principal liable for the act of the agent in arresting a third person for the purpose of ascertaining whether he was concerned in the robbery under investigation.

There is very little difference between counsel as to the general rules of law bearing upon the question under consideration.

The plaintiff cites a great number of cases, but relies principally upon Garretzen v. Duenckel, 50 Mo. 104. In that case the defendant kept a gun store, and had a clerk to assist him in selling firearms and ammunition. He had instructed the clerk never to load a gun. A customer went to the store to buy a gun and the clerk showed him a Henry rifle. The customer requested the clerk to load it so that he could see how it worked. The clerk at first refused, stating that it was against orders to load firearms in the store. The customer refused to buy unless he could see how it was loaded. Thereupon the clerk undertook to load the gun. It was discharged and the plaintiff, who was sitting at a window on the opposite side of the street, was shot. This court, per WAGNER, J., stated the general rule of law as follows: "The universally recognized rule is that a principal is civilly liable for the neglect, fraud or other wrongful act of his agent in the course of his employment, though the principal did not authorize the specific act; but the liability is only for acts committed in the course of the agent's employment. A master is not responsible for any act or omission of his servants which is not connected with the business in which they serve him, though in general he is responsible for the manner in which they execute his orders, and for their negligence in selecting means by which the orders are to be carried

out. In determining whether the particular act is done in the course of a servant's employment, it is proper, first, to inquire whether the servant was, at the time, engaged in serving his master. If the act was done while the servant was at liberty from his service, and pursuing his own ends exclusively there can be no question that the master is not responsible, even though the injuries complained of could not have been committed without the facilities afforded by the servant's relations to his master. [Shearman & Redfield Negli., sec. 63, and notes.] It may not, perhaps, be very easy to reconcile the numerous cases on this subject, but we think that the correct rule extracted and deduced from them will be found as above laid down."

In the same case it was further said: "The true ground upon which a master avoids responsibility for most of the willful acts of his servant, when unauthorized by him, is that they were not done in the course of the servant's employment. When they are so done, the master is liable for them."

In 1 Am. and Eng. Ency. Law (2 Ed.), 1151, the rule is thus stated; "It is a general rule that the principal will be liable where the torts of an agent are done by his express authority, or are the natural consequence resulting from an order given, or where they are committed in the course of the agent's employment, although the principal did not authorize, or justify, or participate in, or even if he disapproved of them. But the principal will not be liable for torts committed by the agent outside the scope of the authority delegated to him."

The same author, at page 1156, says: "The earlier cases, both in this country and in England, support the doctrine that the principal cannot be held liable for the wanton or malicious acts of the agent. The later decisions, however, incline to the rule making the principal liable for acts of the agent done within the scope of his employment, though they be wanton or malicious, and

relieving him from responsibility when the agent steps aside from the business of his principal and wantonly or maliciously commits an act to accomplish an individual purpose of his own."

Stringer v. Railroad, 96 Mo. 299, was an action for damages for personal injury. On the invitation of a brakeman, the plaintiff boarded one of defendant's engines in the city of St. Louis to ride to another point in the city. The engine jumped the track and the plaintiff was injured. It was held that the defendant was not liable, and Snyder v. Railroad, 60 Mo. 419, was cited as authority for the proposition that, "The mere fact that a tortious act is committed by a servant while he is actually engaged in the performance of the service he has been employed to render, cannot make the master liable. Something more is required. It must not only be done while so employed, but it must pertain to the particular duties of that employment." And Sherman v. Railroad, 72 Mo. 62, and Cousins v. Railroad, 66 Mo. 576, were said to hold the same doctrine.

Farber v. Railroad, 116 Mo. 81, was an action for damages for personal injuries. The plaintiff and his friend boarded one of defendant's freight trains in St. Louis to steal a ride to Kirkwood. Before reaching their destination a brakeman observed them and ejected them from the train, while it was in motion, in consequence of which the plaintiff was injured. This court, per GANTT, J., said: "It was said in Snyder v. Railroad, 60 Mo. 413, that, 'it is firmly established [in this State] that the master is civilly liable for a tortious act of his servant, whether of omission or commission, and whether negligent, fraudulent or deceitful, when done in the course of his employment, even though the master did not authorize or know of such acts, or may have disapproved or forbidden them.' [Garretzen v. Duenckel, 50 Mo. 104.] Indeed the doctrine of the old cases as announced in M'Manus v. Crickett, 1 East's Term Reports 106, no longer obtains in the courts of this State.

The liability of the master for the acts of the servant rests now upon the condition whether or not the act of the servant was in the course of his employment. [Perkins v. Railroad, 55 Mo. 211; Craker v. Railroad, 36 Wis. 657.]''

Counsel have cited many cases illustrative of the liability of a principal for the tortious acts of an agent, and with few exceptions they all proceed, or attempt to proceed, on the rule hereinbefore referred to. There is not much difficulty in determining the law applicable to such cases, but the trouble always arises from the application of the law to the particular facts in judgment in each case. The crucial test in all cases is, whether the act of the agent was within the scope of his employment. For instance, the employment of an agent to present a claim, and demand payment thereof from a debtor to his principal, does not include within its scope the right to arrest or assault the debtor if he refuses to pay. Such an employment contemplates only lawful and peaceable acts, and when an agent so clothed with authority commits a trespass upon the debtor he acts wholly outside of the scope of his employment.

The employment of a mercantile agency by a creditor to ascertain and report the financial condition of a debtor does not contemplate within its scope the arrest of the debtor by the mercantile agency even to force him to disclose his true financial condition. In short, the employment of one to ascertain a fact and to report the result thereof does not contemplate within its scope the right to arrest or commit any trespass upon any person whomsoever.

The case at bar is totally different from cases wherein the agent was charged with the duty of keeping and preserving the property of a principal, and in the attempt so to do, caused the arrest of a third person who undertook to interfere or make way with the principal's property.

In the case at bar a grievous wrong was clearly done to the plaintiff, but the defendant is not liable therefor, unless it could be held that the employment of the detective to ascertain the facts as to who was concerned in the hold-up and robbery of its train, contemplated within its scope the right or duty of the detective to cause the arrest of anyone whom the detective might suspect had been concerned therein.     The employment by the defendant of Furlong was to ascertain the facts as to the robbery and to report the result to the defendant's general superintendent.   The fact that Furlong was engaged in the detective business does not alter the defendant's liability in the least.   The defendant's liability would be the same if it had sent one of its own employees to make such investigation and report.   The fact, if it be a fact, that detectives unlawfully arrest persons for the purpose of extorting confessions from them, or of subjecting them to scrutiny by other persons for the purpose of identification, cannot alter the rules of law applicable to the liability of a principal for the acts of his servant unless the principal knew that the detective employed was in the habit of employing such methods, and there is no evidence that such was the case in this instance.

The full extent and scope of Furlong's employment by defendant was to ascertain and report the facts, not to arrest any one or to commit any tortious acts whatever.   The defendant would be liable for all of the acts done by Furlong or his agents within the scope and purpose of the employment, whether the same be tortious or otherwise, but the defendant is not liable for any act of Furlong or his agents that did not fall within the scope of such employment.

For the purpose of this case it may be conceded that Harbaugh made the arrest complained of, although there is scarcely room for doubt that the arrest was made by the direction of the chief of police of Kansas City on the advice of the prosecuting attorney of Jack-

son county, and not at the instance of either the defendant or Harbaugh, although Harbaugh was present and may have aided or abetted therein; yet as Harbaugh had no authority from any one so to do, and as the business of the defendant, which Furlong was employed to conduct, did not include within its scope the arrest of any one, the defendant cannot be held liable for the act of Harbaugh in the premises.

This conclusion makes it unnecessary to consider the other points relied on by the defendant, and necessarily results in holding that the trial court erred in overruling the demurrer to the evidence. As no good purpose can be subserved by a new trial herein, the judgment of the circuit court is reversed without remanding the case.

*Brace, C. J., Gantt, Burgess, Fox* and *Lamm, JJ.,* concur; *Valliant, J.,* dissents.

### DISSENTING OPINION.

VALLIANT, J.—The master's liability for the wrongful act of his servant depends not on the words in which the contract of employment is expressed, for, if that were the case, then care in phraseology would enable the master to avoid all liability. The liability of the master is not one that he contracts to assume, but it is one that is imposed by law on the relation of master and servant. And it is not necessary that the wrongful act of the servant be done with the knowledge or consent of the master; the master may in fact give the servant strict orders to be very careful to avoid hurting others, and yet be liable if the servant disregards the orders.

The theory of the law is that the hand of the servant, moving in the performance of the act which he was employed to do, is the hand of the master, and if in his effort to accomplish that act the servant negligently or willfully injures another, it is in legal theory the hand of the master that does the wrong. The mas-

ter has chosen his own servant and is responsible to others for that servant's lack of capacity or lack of care or lack of regard for the rights of others when that servant is in the act of doing his master's work and when the wrong that he does is his method of accomplishing the work he was set to do. Of course this rule must be accepted with reasonable limits. Extreme cases may be supposed, as were given, for illustration, in the oral argument, and extreme cases may have occurred in which no reasonable master could have anticipated the act which the servant committed, but with that qualification the rule is a just one, and whether the act committed is one that is beyond reason to have anticipated is a question of fact in a given case.

To say that a master may employ an agent possessing the power and the means of inflicting wrong, which the evidence in this case tends to show the agent in this instance possessed, and yet hide his liability behind the innocent form of expression he used when he employed the agent and sent him forth to do his work, would be to mark out an easy method for doing wrong without incurring liability.

And the aptitude of the servant for committing torts is to be judged by his acts rather than by his words. What would it have profited the plaintiff in this case while he was undergoing torture for four days to be told that the detective agency had no lawful power to make arrests and that its emissaries had strict orders to refrain from doing so?

Of course the detective agency had no lawful power to make arrest, but as soon as its agent in this case landed in Kansas City he put himself in close companionship with those who could make arrests and incited them to action. If making or promoting an arrest was not in its line of business and not in contemplation when it was employed to do work of this kind, what was the necessity or pertinency of giving its men orders, on sending them out, not to arrest any one? A merchant

sending out his traveling salesman gives them no such orders; why should a detective agency, which we are asked to believe is as innocent of committing wrong as any one, give such orders to its men?

I do not underrate the merit displayed by the railroad company in seeking to discover the criminals who held up its train for robbery and murder; it had a right to do so in its own self-interest, but doubtless a higher motive also prompted the act. But the merit in the effort to find and punish the criminal does not justify or mitigate the offense of seizing and torturing an innocent man.

To say that the defendant is not liable for the act of its servant under the circumstances which the plaintiff's evidence tends to show in this case is, in my opinion, to lay down a doctrine that is full of danger to the citizen.

For these reasons I am compelled to dissent from the opinion of the majority of the court in this case.