HOWARD ROBBS, a Minor, by Next Friend, NEWTON ROBBS, Respondent, v. MISSOURI PACIFIC RAILWAY COMPANY, a Corporation, and C. M. BOLTON, Appellants.

Springfield Court of Appeals, March 11, 1922.

1. **MASTER AND SERVANT: Watchman, Shooting Trespasser, Held Within Scope of Employment.** A railroad yard watchman, who had been instructed to guard dynamite storage house, *held* to have acted within the scope of his employment in shooting boy running from watchman after being apprehended while preparing to rob storage house.

2. **ASSAULT AND BATTERY: Boy Shot by Railroad Watchman Held not to Have Been Shot While Engaged in the Commission of a Felony.** A boy, who was shot by watchman guarding dynamite storage house when the boy and others were running from the watchman, after they had been apprehended in making preparations to rob the storage house before they had committed any act toward the actual commission of the crime, was not shot while engaged in the commission of a felony, notwithstanding Revised Statutes 1919, section 3683, providing for punishment of one who shall "attempt to commit an offense prohibited by law, and in such attempt shall do any act toward the commission of the offense."

3. ———: **Petition Alleging That Watchman Maliciously and With Intent to Kill Shot Plaintiff, Held not to Raise Issue as to Negligent Shooting.** In action against a railroad for injuries to boy shot by watchman, in which the petition alleged that the watchman maliciously, and with intent to kill, shot the boy, but did not allege negligence, the plaintiff could not recover if the evidence disclosed merely a negligent shooting.

4. ———: **Whether Watchman Intentionally Shot Boy Held for Jury.** In an action against a railroad for injuries to a boy shot by watchman, a question of whether the watchman intentionally shot the boy *held* for the jury.

5. **DAMAGES: "Malicious" Within Rule as to Punitive Damages Defined.** The word "malicious," within the rule as to punitive damages, means the intentional doing of a wrongful act without just cause or excuse, and does not require the act to have been done in spite or ill will.

6. **ASSAULT AND BATTERY:** Instruction on Punitive Damages to "Punish Defendant" in Action Against Two Defendants, Held Erroneous. In an action against a railroad and its watchman for injuries to boy shot by the watchman, in which it was alleged that the shooting was malicious and wilful, instruction, authorizing award of such exemplary damages "as will be a punishment to defendant," *held* erroneous, in that the jury would have been misled to believe therefrom that the punitive damages would punish the watchman only.

7. ———: Awarding Punitive Damages Discretionary with Jury. In action against a railroad for injuries to boy shot by watchman, in which it was alleged that the shooting was malicious and willful, the awarding of punitive damages was discretionary with the jury.

Appeal from the Circuit Court of Butler County.—*Hon. Almon Ing,* Judge.

AFFIRMED (*on condition*).

*James F. Green* and *J. C. Sheppard* for appellants.

(1) The judgment cannot be sustained against appellant Railroad Company for the reason that the testimony fails to show that appellant, Bolton, at the time he shot respondent was performing any act for the Company which pertained to the particular duties of his employment. Milton v. Railroad, 193 Mo. 46; Snider v. Hannibal & St. Jo. R. R. Co., 60 Mo. 413; Golden v. Newbrand, 52 Iowa, 59; Holler v. Ross, 68 N. J. L. 324, 59 L. R. A. 943; Walker v. Railroad, 121 Mo. 575. (2) The verdict and judgment cannot be sustained against either of the appellants if it be found that appellant Bolton was attempting to apprehend the respondent for the commission, or attempted commission of the crime of burglary, as any private person has a right to arrest for felony actually committed, or attempted to be committed in his presence, and may even kill the felon, if necessary, to procure his arrest, or prevent his escape. 5 C. J. 410, 411, sec. 39, 40; State v. Albright, 144 Mo. 638; Pandjiris v. Hartman, 196 Mo. 539. (3) Respondent having pleaded a wilful shooting cannot recover on the theory

of negligence, because it is not pleaded, and the two are inconsistent. Christy v. Butcher, 153 Mo. App. 397. (4) The court erred in allowing the jury under the instructions to give punitive damages because there was no proof of malice. State v. Prater, 130 Mo. App. 355.

*David W. Hill* and *Sam M. Phillips* for respondent.

(1) Defendant C. M. Bolton was in his line of employment at the time he shot plaintiff. He was employed as an armed guard of defendant's dynamite cellar and while in the discharge of his duties as such he shot the plaintiff. This made the shooting in the scope of his employment. Hanel v. Wabash Railroad Co., 119 Mo. 325; Green v. Standard Oil Co. of Ind., 199 S. W. 746; Sturgis v. K. C. Ry. Co., 228 S. W. 861; Redd v. Mo. Pac. Ry. Co., 161 Mo. App. 522, 143 S. W. 555; Moore v. Jefferson Light Co., 163 Mo. App. 266, 146 S. W. 825; Maniaci v. Express Co., 266 Mo. 633, 182 S. W. 981; Whitaker v. Railroad, 252 Mo. 438; 160 S. W. 1009; Davis v. Railroad, 192 Mo. App. 419, 182 S. W. 826; Wahl v. Railroad, 203 Mo. 272; Chandler v. Gloyd, 217 Mo. 412, 116 S. W. 1073; Fellhauer v. Railroad Co., 191 Mo. App. 137, 177 S. W. 795; Slothower v. Clark, 191 Mo. App. 105, 179 S. W. 55; Hellriegel v. Dunham, 192 Mo. App. 43, 179 S. W. 763; Winn v. K. C. Belt Ry. Co., 151 S. W. 98, 245 Mo. 406; Meade v. Railroad, 68 Mo. App. 92; Curtis v. Railroad, 99 Mo. App. 506; McDonald v. Railroad, 146 S. W. 83, 165 Mo. App. 75. (2) The fact that plaintiff and his companions intended to break into defendants' cellar and take some of its explosives is no felony, there being no overt act toward carrying the intention into effect. The mere intent to commit an offense is not a crime. State v. Rider, 90 Mo. 54; State v. Painter, 67 Mo. 89; State v. Davidson, 157 S. W. 890; State v. Riseling, 186 Mo. 529; State v. Hayden, 141 Mo. 311; People v. Webb, 127 Mich. 29, 86 N. W. 406; People v. Young, 122 Mich. 292, (Attempt to commit burglary) 81 N. W. 114, 47 L. R. A. 108; McDade v. People, 29

Mich. 50. The jury having passed upon a controverted issue of facts upon which there was evidence both ways, their verdict is conclusive and will not be disturbed by the appellate court on appeal. Porter v. Hetherington, 158 S. W. 469, 172 Mo. App. 502; Johnson v. Railway, 166 S. W. 1105, 183 Mo. App. 403; Mann v. Weiss, 170 S. W. 355, 185 Mo. App. 335; Matthews v. Coal Co., 177 S. W. 650; Davis v. Railroad, 182 S. W. 826, 192 Mo. App. 419; Cundiff v. R. N. of A., 144 S. W. 128, 162 Mo. App. 117; Kelly v. Ross, 148 S. W. 1000, 165 Mo. App. 475; Hutton v. Railroad, 150 S. W. 722, 166 Mo. App. 645; City of Kennett v. Katz Const. Co., 202 S. W. 558, 273 Mo. 279; Koslove v. Dittmeier, 203 S. W. 499; Murray v. Bank, 206 S. W. 577; Plummer v. Ford, 208 S. W. 489, and other cases too numerous to cite. (4) Criminal and penal statutes are to be strictly construed in favor of the defendant and against the plaintiff. State v. Mc-Mahon, 137 S. W. 872, 234 Mo. 611; Howell v. Stewart, 54 Mo. 400; State v. Jaguer, 63 Mo. 403; State v. Gritzner, 134 Mo. 512; State v. Bryant, 90 Mo. 534; State v. Mc-Cauce, 110 Mo. 398; State v. Reid, 125 Mo. 43; State v. Howard, 137 Mo. 289; State v. Butler, 178 Mo. 272; State v. Balch, 178 Mo. 392. (5) Plaintiff being guilty of no criminal offense, either felony or misdemeanor, did defendant have a right to shoot him, conceding for the purpose of argument only that the shot was fired with the intent to protect the railway company's dynamite? We answer the query emphatically, no. See in this connection the following cases: Hartman v. Hoernle, 201 S. W. 911; Callahan v. Billat, 68 Mo. App. 435; State v. Martin, 52 Mo. App. 611; State v. Dooley, 121 Mo. 591; State v. Forsythe, 89 Mo. 671; Shellabarger v. Morris, 115 Mo. App. 569; Maniaci v. Interurban Express Co., 266 Mo. 633, 182 S. W. 981.

BRADLEY, J.—Plaintiff, a minor, thirteen years of age, by next friend, proceeded against defendants for personal injury resulting from being shot by defendant, Bolton. On a jury trial plaintiff had judgment for $2000

actual and $2000 punitive damages. The usual motion was filed and overruled, and defendants appealed.

Plaintiff alleges that on July 15, 1920, defendant Bolton, while in the employ of defendant railway company as an armed watchman or guard of its dynamite storage house, and while acting for the railway company and within the scope of his employment, did unlawfully, feloniously, on purpose, wilfully and maliciously and with intent to kill, and without just cause or excuse, shoot plaintiff in and upon the right side of his neck, and that the bullet passed through and out on the left side of the face, all to his injury, damage, etc. Defendants answered by a general denial, and further alleged that plaintiff and two others at the time plaintiff was shot went to the railway company's powder house in which were kept dynamite, powder, tools, etc., and attempted to burglarize said house and steal the dynamite, powder, etc., therein, and that while plaintiff and those with him were attempting to burglarize said house, defendant Bolton approached, and that plaintiff and those with him discovered the approach of Bolton and fled, and that Bolton pursued, and called to them to halt, but that said parties continued to flee, and that Bolton, in order to frighten them, cause them to stop that he might apprehend them for the commission of a felony, fired his pistol in the air with no intention of hitting any one, and that if plaintiff was injured it was purely accidental, and without malice. The reply is a general denial.

Plaintiff with two other boys some two years older had been breaking into this powder house and stealing dynamite, powder, caps, fuses, etc. Bolton was a deputy sheriff of Cape Girardeau county, and had done some work as special agent for the defendant railway company. On July 11th he was called to Poplar Bluff in Butler county and directed to guard the powder house. Bolton testified that he was directed "to stay there and try to catch the parties; that if they were boys, not to hurt any boys, just find out who they were, but if men

210 M. A.—28

catch them." Thomas F. Cadwallader, special agent for defendant railway company, instructed Bolton as to his duties and told him to be careful and not hurt any boys in case it turned out to be boys that came up there to rob the place. "I told him to protect the property and prevent it from being stolen like it had been. Q. Did you tell him to arrest any body? Did you give him any special instructions along that line? A. I don't know that I did especially. I supposed he would know what to do as an officer." Bolton had been on the job from July 13th. Plaintiff was shot on the 15th. Bolton describes the incident of the shooting as follows: "On the night of the 15th I went out there about eight o'clock, or near eight o'clock and took my position as usual, and somewhere about nine-thirty, or close to ten o'clock, between nine and ten, it was pretty dark, you know, on my side of the hill it was real dark, but the reflection of the lights against the other side of the hill would let me see anybody coming over the top of the hill, or see enough to tell it was people or anything like that. I was in the usual position where I usually stayed, and I saw three fellows come up over the hill, and they hesitated when they got on the top of the hill, talking a little bit; they stopped there, the two went on to the west powder house, one stood out maybe forty feet from the powder house, and the other two went on to the door, and they got down there and began to knock and hammer, and flash a light of some kind, I guess they had been there three or four minutes, and they quit knocking for the reason they had the door open. I thought I would let the whole bunch get in there, get in the house, and I would go there and close the door. One waited out there, and I saw I could not do that and so, when they quit knocking, I thought they had the door open, they stood there; I saw the other fellow was not going to go down and I thought I could go there and make a run for them. As soon as I got out of the shade of the trees the fellow on the watch saw me coming, he said 'there is somebody here.' I knew then

the thing was up and I run—Q. What did they do? A. They started to run out. There was a kind of wall on each side of the door coming out from the powder house and they were in there, and they had to run towards me. When they started to run I holloed, 'Halt, stop there.' So they kept going, coming out of there, and one turned one way and one the other around the house. It is a round concern. When they started to run I said, 'I will give them a good scare,' and I began to shoot. They didn't make any racket. They got together and ran on over the hill, and I followed on the other side of the break of the hill; I stopped and it was kind of over that way (indicating), and it made it dark in there on the other side of the hill; I stopped and looked and listened, and I heard somebody say 'Help' right close to me, and I flashed my flashlight on him and looked there and discovered the boy." Bolton further testified: "I saw the fellows running, you know, all in a bunch together. It was not my intention when I shot to hit them. I had no idea of hitting them. I thought I couldn't get the whole bunch in there and catch them, I will give them a good scare. I did not intend to hit anyone at all. I did not intend to shoot low enough to hit them; I figured I was shooting over their heads." On cross-examination Bolton stated: "When I started out the boys came towards me; they only came a step or two—maybe it would take three or four steps to get out of the chute. Then they turned and ran from me. As soon as they turned and started running from me I commenced to shoot." Again Bolton testified: "When I got out of the shadow I was about one hundred feet from the door of the powder house. I do not know if it was the boy I shot that gave the alarm, or whether it was one of the others. I started running towards the powder house. I only saw two boys there at the powder house, and they started back out of the entry way towards me. I did not shoot at that time, they had turned around the powder house before I shot, one turned one way and one the other. To the best of my knowledge, I

would say I was going a little bit northwest at the time I was approaching the powder house. The boys, they both came facing me. They were not running towards the tracks, but towards Poplar Bluff. Q. How close were they together? A. I guess something like you three men. Something like five or six feet apart. I could not distinguish them and tell them apart. I could locate one and see one and see another. At this time, while they were running away from me, I fired the first shot. I shot with a thirty-two automatic pistol, which I had in my hand. Prior to the time I drew it I had it in my hand pretty well all of the time. I thought I might need it, and if I needed it at all, I needed it in my hand. I might say that I was using it to guard the company's property. I do not remember how long I had the pistol in my hand before I saw the boys at all. I stood there with the pistol in my hand. I had not thought of having the pistol for the purpose of shooting if necessary to protect the dynamite house, to protect the company's property and myself, too. I believe I fired about four or five shots. The pistol shoots nine times. It could have been shot nine times without re-loading it. It must have been pointed in the direction of the boys at the time I fired the shots, and hit one of them, I thought I was firing over them. I did not see one of them stumble, stagger and fall. I fired the shots pretty rapidly. I was only firing the shots for the purpose of frightening the boys. I did not think I was shooting directly at them."

Plaintiff testified that he and the other boys went down to get some dynamite; that as they approached the powder house he was in the lead, the other boys behind him; that when he got within five or ten feet of the door of the powder house he saw Bolton out in the shadow of the trees. "I turned around and pointed at him and told the other boys to beat it, and they started off running, and I started about three or four steps and he shot. I was running away from him, and I was running sideways, running toward a kind of ditch. He

fired two shots, and the second shot struck me. I never heard any more. I was about two hundred feet from the defendant Bolton at the time he fired the shot. He was about two hundred feet from me. He was, at that time, about two hundred feet from the powder house, and I was about eight or ten feet. I was running toward Poplar Bluff, and away from the power house."

Error is assigned on the grounds: (1) That the court refused to direct a verdict for defendants; (2) that certain instructions were erroneously given and refused.

Defendants contend that their instruction in the nature of a demurrer should have been given especially as to the railway company, because: (1) The evidence failed to show that Bolton was acting within the scope of his employment at the time he shot plaintiff; (2) the evidence shows that plaintiff at the time he was shot was engaged in the commission of a felony and that Bolton had a right to arrest him, and to even shoot him if necessary in order to arrest him; (3) the petition alleges that Bolton feloniously on purpose, willfully and maliciously and with intent to kill and without just cause or excuse shot plaintiff and the evidence failed to show anything in that respect except that Bolton shot plaintiff.

In State v. Rider, 90 Mo. 54 l. c. 60, this language appears: "The mere intent to commit a crime is not a crime. An attempt to perpetrate it is necessary to constitute guilt in law. One may arm himself with the purpose of seeking and killing an adversary, and may seek and find him, yet, if guilty of no overt act, commits no crime."

Again in State v. Painter, 67 Mo. 84 l. c. 89, we read: "Neither a purpose to make an assault, nor any amount of preparation for doing so, will constitute an assault, unless followed by some hostile demonstration against the person toward whom the purpose is entertained. If the defendant had gone and procured the gun for the express purpose of taking the life of Andrews, but after

coming up with Andrews, made no demonstration toward the accomplishment of that purpose, he would not have been guilty. A bare intent to commit an offense is not punishable by our law." [See, also, State v. Davidson, 172 Mo. App. 356, 157 S. W. 890; State v. Riseling, 186 Mo. 521, 85 S. W. 372, and State v. Mayden, 141 Mo. 311, 42 S. W. 826.]

In the case at bar plaintiff had not gone beyond the realm of preparation for the intended burglary. No *act* toward the actual commission had been committed, and it is our conclusion that plaintiff had committed no offense, and was therefore not engaged in the commission of a felony at the time he was shot, and was not fleeing to avoid arrest for the commission of a felony. In fact plaintiff was at most no more than a trespasser and Bolton's rights were limited. In Hartman v. Hoernle, 201 S. W. (Mo. App.) 911, it appears that defendant shot plaintiff while he, defendant, was on guard to protect his water melons. It was there said: "It is argued that in entering upon defendant's land, for the purpose aforesaid, plaintiff took the chance of receiving an injury of this character, and hence cannot recover." But we regard it as clear that this argument is without merit. The decisions of our courts declare the rule that plaintiff may make a prima-facie case by proof that he was shot by the defendant; the burden being then cast upon the defendant to justify the act. [See Morgan v. Mulhall, 214 Mo. 451, loc. cit. 459, 114 S. W. 4.] But in any event, in the instant case, there can be no doubt that while defendant was entitled to resist the trespass upon his land, and the taking of his melons, he was not warranted in using more force than was necessary to eject the trespassers or to protect his property, and particularly not justified in unnecessarily assaulting plaintiff with a deadly weapon. Under the circumstances though plaintiff, when injured, was a trespasser, and in the act of violating the law, he cannot be denied a recovery for the injuries thus inflicted upon him. [See Hooker v. Miller, 37 Iowa, 613, 18 Am. Rep. 18; Pollock on Torts (1894), p.

206.]'' [See, also, State v. Dooley, 121 Mo. 591, 26 S. W. 558; and State v. Forsythe, 89 Mo. 667, 1 S. W. 834.]

(3) Plaintiff's petition alleges that Bolton did unlawfully, feloniously, on purpose, willfully and maliciously and with intent to kill, and without just cause, shoot him, etc. Defendants contend that there is no evidence to support any of these allegations except that Bolton shot plaintiff. Stated in another way defendants contend that plaintiff not having alleged that Bolton shot him under such circumstances as to constitute negligence, he cannot recover since the evidence does no more than to tend to show negligence. So far as this cause is concerned the descriptive words unlawfully, etc., amount to the allegation that Bolton intentionally shot plaintiff. Malice arises from an evil purpose, negligence from a failure of purpose; malice is imputable to a defect of the heart; negligence to a defect of the intellect. If what results corresponds to what the actor intended, then the offense is malicious; if the result does not so correspond and the actor did not at the time exercise due care, the offense is negligent. [1 Wharton's Crim. Law (11 Ed.), sec. 163.] Wharton in section 215, lays down the principle that if an act is not intentional that the notion of intention precludes the notion of negligence. If, therefore, the evidence discloses no more than a negligent shooting, plaintiff cannot recover under his petition. Did Bolton *intentionally* shoot plaintiff within the meaning of the law? Bolton said that he fired the shots for the purpose of frightening the boys; that he did not think he was shooting directly at them. In State v. Hamilton, 170 Mo. 377, 70 S. W. 876, it was held that where one fires a pistol towards other persons on being ejected from a store, and wounds one of them, he cannot defend a prosecution for assault to kill by testifying that he shot for effect and did not intend to do any harm. In this case the court said: ''This court has long since put the *quietus* on the question of shooting without intention of hitting any one, and held no such instruction should be given in favor of a defendant.

[State v. Nelson, 118 Mo. 124, and subseq. cases.]'' In State v. Rollins, 226 Mo. 524, 126 S. W. 478, in passing on a similar question the court said: ''Taking the most favorable view of the defendant's own testimony, it is too plain for doubt that he did not shoot and kill the deceased in an effort to arrest him. He says himself that he did not fire the pistol shots for any such purpose, but merely to intimidate and frighten him, and had no intention whatever of killing him, so that, as already said, the right to kill, if necessary in making an arrest, has nothing to do with the case as presented on this record. The sole and only question is whether the court correctly submitted to the jury the question whether the defendant was guilty of negligence and carelessness in firing into the room of the deceased as he did, and showed a lack of regard for human life, or as he put it in his own instruction, was guilty of a recklessness and carelessness incompatible with the proper regard for human life, and this certainly was the most favorable view that could have been taken of the conduct of the defendant on this occasion.'' [See, also, State v. Vaughn, 200 Mo. 1, 98 S. W. 2; State v. King, 203 Mo. 560, 102 S. W. 515; State v. Tucker, 232 Mo. 1, 133 S. W. 27; State v. Young, 225 S. W. (Mo.) 908.] We think that the question as to whether Bolton intentionally shot plaintiff was under the facts a proper question for the jury.

(1) The phrase—''within the scope of the employment'' has had numerous constructions and applications, and we do not feel that we could add to the literature of the law or explain this phrase in better fashion or in a more understandable way than has been done in the many efforts reported. We think, in view of the case law, that Bolton was within the scope of his employment as that language is understood. [Haehl v. Wabash Railroad Co., 119 Mo. 325, 24 S. W. 327; Green v. Standard Oil Co., 199 Mo. App. (S. W.) 746; Sturgis v. K. C. Ry. Co., 228 S. W, 861 (Mo. App.); Redd v. Mo. Pac. Ry. Co., 161 Mo. App. 522, 143 S. W. 555; Moore v. Jefferson Light Co., 163 Mo. App. 266, 146 S.

W. 825; Maniaci v. Express Co., 266 Mo. 633, 182 S.
W. 981; Whitaker v. Railroad, 252 Mo. 438, 160 S. W.
1009; Davis v. Railroad, 192 Mo. App. 419, 182 S. W.
826; Wahl v. Transit Co.; 203 Mo. l. c. 272, 101 S. W.
1; Chandler v. Gloyd, 217 Mo. l. c. 412, 116 S. W. 1073;
Fellhauer v. Railroad Co., 191 Mo. App. 137, 177 S. W.
795; Slothower v. Clark, 191 Mo. App. 105, 179 S. W.
55; Hellriegel v. Dunham, 192 Mo. App. 43, 179 S. W.
763; Winn. v. K. C. Belt Ry. Co., 245 Mo. 406, 151
S. W. 98; Meade v. Railroad, 68 Mo. App. 92; Curtis
v. Railroad, 99 Mo. App. l. c. 506; McDonald v. Rail-
road, 165, Mo. App. 75, 146 S. W. 83.]

Defendants cite Milton v. Railroad, 193 Mo. 46, 91
S. W. 949; Snider v. Railroad, 60 Mo. 413; Walker v.
Railroad, 121 Mo. 575, 26 S. W. 360, and some cases
from other jurisdictions to support their contention that
Bolton was not within the scope of his employment. We
have examined these and other cases, but find no one,
especially from our own State, that supports defendants.
In fact the Missouri cases all tended to the contrary if
not directly in point.

(2) Defendants contend that plaintiff cannot re-
cover because he was at the time he was shot engaged in
the commission of a felony, and that Bolton had a right
to shoot him if such was necessary to arrest him.
Bolton, however, makes no claim that he shot in order
to arrest. But we will proceed with the point on de-
fendants' theory. Was plaintiff engaged in the com-
mission of a felony? The three boys, according to plain-
tiff, and we reason from plaintiff's version since the jury
found his version to be true, were on their way, one
carrying a crow bar, to burglarize and steal the goods,
etc., in the powder house. Defendants urge in effect
that plaintiff having decided upon the commission of a
burglary, that his *act* of walking to the place to be
burglarized, and being frustrated by Bolton was an *at-
tempt* to commit a felony. Section 3683, Revised Stat-
utes 1919, provides that "every person who shall at-
tempt to commit an offense prohibited by law, and in

such attempt shall do any act toward the commission of such offense, but shall fail in the perpetration thereof, or shall be prevented or intercepted in executing the same, upon conviction'' etc. We do not agree with defendants that plaintiff was engaged in the commission of a felony. At common law the act or attempt must be of such a character as to advance the preparation to commit the crime beyond the sphere of mere intent, and reach far enough to amount to a commencement of the consummation of the crime intended. [1 Wharton's Crim. Law (11 Ed.), p. 282.] The act done must not be merely preparatory, but must reach toward accomplishment sufficiently to be a commencement of the commission of the crime. [1 Wharton's Crim. Law (11 Ed.), p. 283; Ex Parte Turner, 104 Pac. (Okla.) 1071.] In Peoples v. Youngs, 122 Mich. 292, 81 N. W. 114, 47 L. R. A. 108, the facts appear as follows: ''Respondent lived about nine miles southeast of Hillsdale. Had worked husking corn in the fall of 1898 for Mr. Walker, who lived about ten miles northeast of Hillsdale. On May 22, one Munson Foughty met respondent in a saloon in Hillsdale. He proposed to Foughty to go over to Walker's and get his money. He stated to Foughty that Walker was possessed of a considerable sum of money; that he knew where Walker kept it—in the bureau drawer; and that he would get a pair of carpet slippers and a little chloroform. He fixed the following Saturday night as the time for the commission of the crime, telling Foughty that he would be in Hillsdale on Saturday for that purpose, and requested Foughty to meet him at the saloon. Foughty met him on that day at the appointed place. Respondent had a revolver, went out and purchased some cartridges, and returned to the saloon, and the two went down in the basement of the saloon. Respondent then loaded his revolver, saying: 'That came pretty near killing one man the other night, and I am going to have the money tonight, or it will kill another man.' He asked Foughty if he had a revolver, and Foughty replied that he had. Respondent then went

into a drug store and purchased some chloroform, to be used in the commission of the crime. He had the slippers upon his person, to be used in entering the house. On emerging from the drug store he was arrested, and the slippers, chloroform, revolver and cartridges were found upon his person. He further stated to Foughty that he knew where Walker lived; that he would get in through the window and chloroform him. When arrested, he denied having any chloroform, and, when it was found, said that his mother had sent him for it. These facts were not controverted, as respondent introduced no testimony.''

The Michigan statute as appears in the reported case is identical with ours so far as defining the offense of an *attempt* to commit a crime is concerned. In that case it was held that no offense had been committed; that the statute was but declaratory of the common law and did not change the rule at common law as to what constituted an attempt to commit a crime. In a later Michigan case (People v. Webb, 127 Mich. 29, 86 N. W. 406), it was ruled that under the *attempt* statute a conviction for conveying into jail instruments to enable a prisoner to escape could not be sustained on evidence that saws and files concealed in articles sought to be delivered to prisoners were brought into the sheriff's office in the jail building, but were discovered by him and not delivered to the prisoners.

Defendants challenge instructions 1 and 2 given for plaintiff; and complain of the refusal or their instructions 5 and 6. Number 1 is challenged on the ground that it ignores the defense that plaintiff was fleeing to avoid arrest and in order to apprehend him Bolton shot. There is no evidence to support such defense. Bolton, as we have pointed out, did not claim that he shot in order to effect the arrest of plaintiff. On the contrary he says he shot to frighten only.

Plaintiff's instruction number 2 and defendants' instruction number 6 go to the right of plaintiff to recover punitive damages. Plaintiff's instruction is challenged

on the theory that plaintiff could not under the facts recover for punitive damages; and also on the use of the word defendant which we have italicized. Plaintiff's instruction number 2 so far as concerns its definition of malice is taken from McNamara v. Transit Co., 182 Mo. l.c. 680, cited supra, and is as follows: "The court instructs the jury that if you find for the plaintiff, you will assess his compensatory damages at such sum as will compensate plaintiff for his injuries and physical and mental suffering, if any, caused by said injuries, not to exceed the sum five thousand dollars. And if you find further evidence (sic) that the shooting of plaintiff, if at all, by defendant C. M. Bolton was willful and malicious, (and by the term "malicious" is not meant spite or ill will, but intentional doing of a wrongful act without just cause or excuse), you may allow such further damages, known in law as exemplary, as will be a punishment to *defendant* and a wholesome warning to others, not to exceed the sum of five thousand dollars." The instruction in the McNamara case was approved under a state of facts which makes, we think, the instruction applicable here. Defendants contend that no malice was shown, and that, therefore, plaintiff was not entitled to recover punitive damages. This question is discussed in the McNamara case and we do not deem it necessary to discuss the matter at length here. The definition of malice contained in the instruction is proper and the accepted meaning by all the authorities. We have already determined that it was proper to submit to the jury the question of whether Bolton intentionally shot plaintiff without just cause or excuse. The jury found for plaintiff, and, therefore, found that Bolton intentionally shot plaintiff without just cause or excuse. If he intentionally shot plaintiff without just cause or excuse then such shooting was done maliciously as that term is understood in the law. But we regard, under the facts here, the use of the singular number in instruction 2 as of serious consequence. The awarding of punitive damages is discre-

tionary with the jury. The jury could award such damages if they wanted to, or refuse to do so if they so desired. [Smith v. Railroad, 192 Mo. App. 210, 180 S. W. 1036.] Did the jury attach any significance to the use of the singular number as it appears in the instruction? The evidence all centered around and about defendant Bolton. The opinion of the jury was that he shot a boy fleeing from him. The instruction names Bolton, and is so worded that the singular number as used would easily give support to the idea that punitive damages would punish Bolton only. We think that the instruction on punitive damages in the event of another trial should be so worded that the jury will be properly directed without the uncertainty that is apparent in this instruction. The uncertainty comes about because there are two defendants. If there were only one defendant of course there could be no uncertainty in the respect under consideration. Instruction one directed a verdict against both defendants, if certain facts were found, while instruction two might be construed as meaning that only one should be punished by paying punitive damages. In this respect the instructions are somewhat inconsistent.

Instruction number five requested by defendants and refused submits an issue which there was no evidence to support, viz., that Bolton shot while attempting to arrest plaintiff. We have already pointed out that Bolton made no such claim. If plaintiff prefers and will within ten days from the filing of this opinion file here a *remittitur* of the $2000 punitive damages the judgment for $2000 actual damages will be affirmed; otherwise the cause will be reversed and remanded for the error in the instruction on punitive damages. *Cox, P. J.,* and *Farrington, J.,* concur.