[Sac. No. 5236. In Bank.—July 10, 1939.]

PACIFIC COAST JOINT STOCK LAND BANK OF SAN FRANCISCO (a Corporation), Plaintiff and Respondent, v. C. LEE JONES et al., Defendants and Respondents; PACIFIC BROOM CORN COMPANY (a Corporation) et al., Appellants.

Klein & Clarke and R. C. Ramsay for Appellants.

Johnson & Harmon for Plaintiff and Respondent.

F. M. Brack for Defendants and Respondents Legare.

No appearance for Defendant and Respondent Jones.

EDMONDS, J.—The controversy presented by this appeal concerns conflicting claims to a crop of broom corn which had been mortgaged by C. Lee Jones and S. C. Legare to the respondent bank during the time they were vendees in possession of the land on which it was grown. The bank's right to foreclose this mortgage was challenged by the appellants, all of whom had advanced money or services for the purpose of growing the crop. James Ryan, who farmed the land, and Jones and Legare, although defendants in the action, did not appeal from the decree of foreclosure in favor of the bank.

In 1935 Jones and Legare were in possession of a 1000-acre tract of farming land in Stanislaus County under an agreement to purchase it from the bank. They were then some $15,000 in arrears in their instalment payments on the purchase price, and in September of that year respondent required them to execute a mortgage "on all crops . . . now standing, planted or growing, or that may hereafter during the continuance hereof be standing, planted or growing" on the land. This mortgage was recorded; but nothing was realized by the bank from the 1935 crops.

The next year Jones and Legare, as a means of relieving their financial burden, decided to lease a portion of the land, and with this purpose in mind Jones in April, 1936, entered into oral negotiations with the Pacific Broom Corn Company, through its agents and one Clarke, its president. It developed that the company was interested in about 600 acres on which broom corn could be grown. According to Jones' testimony, in several conversations with them he explained that he and Legare were in financial straits, that they had given a crop mortgage, and that no lease could be made except upon the condition that the rent be paid in advance or be properly guaranteed. Jones also said that when he asked about the financial status of the company, one of its agents informed him that "all financial responsibilities of the Pacific Broom Company were assumed by Liberman and Rosencrantz". Inquiries which Jones subsequently made at a San Francisco bank indicated that Liberman and Rosencrantz were financially responsible.

Jones and Legare did not wish to farm the property, and it became necessary to obtain someone to undertake this work. As a part of the plan then being considered, Ryan, a farmer living in the vicinity, was engaged by the company which agreed with him to finance his operations and to buy the crop produced.

Negotiations having reached this stage, Clarke then had a lease prepared. This lease was by Jones and Legare, as lessors, to Ryan, as lessee, for a cash rental to be paid by the lessee out of the money realized from the sale of the crop to the company. Clarke first secured the signature of Ryan, and then presented it to Legare at his residence on the tract, Jones being away at the time. According to Legare, when he asked Clarke where the guarantee was, the latter handed

him an order executed by Ryan directing the company to pay the rent from the proceeds of the crops after deduction of all production costs advanced. Legare remarked that this did not amount to a guarantee of rent and refused to sign the lease, but he retained it to show to his partner, Jones. He also testified that until the lease was presented, they believed that it would run to the company as lessee.

However, as the season was late, the next day, at Clarke's suggestion, Ryan went on the land and began preparing it for planting. A week or so later Ryan asked Legare if the lease had been signed. Legare answered in the negative, explaining that they had not received the guarantee which had been promised, but that Jones was trying to get the matter straightened out. Planting and irrigation of the crop followed and several months later Ryan again inquired about the lease. He was told that the lease had not yet been signed because of the failure to deliver the guarantee. Eventually, the lease was signed by Legare and given to Jones, who never signed it because the promised guarantee by Liberman and Rosencrantz was not delivered, and it remained in his possession.

Because Ryan had not grown broom corn before, he took directions with regard to preparing the land, and planting, cultivating, and harvesting the crop from the company. Production expenses were advanced by Liberman and Rosencrantz for the account of the company. The crop ripened in September and harvesting was commenced. As the broom corn was threshed and baled, the company and Liberman and Rosencrantz began hauling it away. At this time Legare approached Clarke, who was supervising operations, and asked him what his intentions were with regard to rent. Clarke told him that he had satisfied the bank. Undoubtedly, this was the first time Legare knew that the company did not intend to deliver the guarantee, for he immediately stopped Clarke from removing any more corn and told Ryan's foreman that no more of it could be taken from the property.

Jones and Legare then notified the bank that the crop was being removed. It asked the company and Liberman and Rosencrantz what their intentions were and was told that the bank had no right to the crop, for the reason that the corn had been grown by Ryan, whom they referred to as "our man". This action was then commenced and a receiver appointed

to take possession of the crop. About two-thirds of the corn had been cut and was being dried on the ground.

From these facts the trial court determined that Ryan was not a lessee either by parol or by estoppel, but a licensee; that the license was revoked at the time Legare stopped the removal of the corn and that the lien of the mortgage attached to the unsevered portion of the crop as the property of the mortgagors, Jones and Legare. It also found that the bank had no right to the corn which had been cut at the time the receiver took possession.

■ The respondent relies upon the rule that an owner who ejects a trespasser from his land is entitled to any crop which is standing upon it. (*Huerstal* v. *Muir*, 64 Cal. 450, 453 [2 Pac. 33]; *Imperial Farming Co.* v. *Van Horn*, 107 Cal. App. 717 [290 Pac. 1077]; see annotation, 39 A. L. R. 948.) According to this principle of law, by analogy, Jones and Legare, as purchasers of the land, were entitled to the standing crop if the appellants' rights amounted only to a license to occupy the land. ■ A chattel mortgage on future crops is valid under the common law doctrine of potential possession (*Arques* v. *Wasson*, 51 Cal. 620 [21 Am. Rep. 718]), but the lien of a continuing crop mortgage does not attach to a crop planted and produced by a third party to whom the mortgagor has conveyed an estate in the property. (*First Nat. Bank* v. *Brashear*, 200 Cal. 389 [253 Pac. 143].) Thus, in the case at bar if, by virtue of the facts shown, Ryan or the appellants acquired a leasehold interest in the land, their claim to the entire crop is paramount. If, on the other hand, the corn was planted and grown under a mere license, the respondent's lien attached and is entitled to priority. Therefore, the answer to the principal question for decision depends upon the relationship created by the conduct of the parties.

The appellants have divided their argument relating to various aspects of the evidence and findings under a number of headings. Convenience and clarity will be served by consolidating several of these points for discussion.

■ First, they contend that the evidence and findings do not support the trial court's conclusion that they were mere licensees; on the contrary the undisputed facts compel the conclusion that a tenancy-at-will was created. Undoubtedly, although the usual lease, like any other contract requires the express or implied mutual assent of the parties,

the relationship of landlord and tenant may come into existence by operation of law although no enforceable agreement has ever been entered into by the parties. Thus, it has been held that a tenancy-at-will results where one enters and occupies land with permission of the owner under an oral contract which is invalid under the statute of frauds. (*Carteri* v. *Roberts,* 140 Cal. 164 [73 Pac. 818] ; *Goodwin* v. *Perkins,* 134 Cal. 564 [66 Pac. 793]) ; or under a proposed written lease which is never executed (*Linnard* v. *Sonnenschein,* 94 Cal. App. 729 [272 Pac. 315]) ; or under an ineffective conveyance or agreement to convey (*Hayden* v. *Collins,* 1 Cal. App. 259 [81 Pac. 1120].) It has likewise been held that mere permissive occupancy where no rent is reserved and no term agreed upon gives rise to a tenancy-at-will. (*Jones* v. *Shay,* 50 Cal. 508.)

But these cases, on which the appellants rely, are not precisely in point under the facts here presented. The trial court found that in their oral negotiations the parties agreed to enter into a lease provided the rental should be guaranteed by Liberman and Rosencrantz and that all persons involved in the negotiations were informed of the requirement concerning such guaranty as a condition precedent to the execution of any lease. These findings have clear and substantial support, not only in the testimony of Jones and Legare but also in the testimony of an agent of the company. Moreover, on the day before Ryan and appellants started farming operations on the land, Legare, in the presence of Clarke and Ryan, refused to sign the proposed lease upon the ground that the promised guaranty had not been delivered. Twice later Ryan was informed that this was the reason for the subsequent refusals of Jones and Legare to execute the lease. The situation presented, therefore, is one where the proposed lessors positively and persistently refused to enter into a contract creating the relation of landlord and tenant because, as they contended, a condition required by them had not been met.

Under such circumstances the law will not imply the relationship of landlord and tenant. The principle is akin to the rule of contracts that if the parties contemplate a reduction to writing of an agreement reached in preliminary oral negotiations, there is no contract until the writing is signed. (*Toms* v. *Hellman,* 115 Cal. App. 74 [1 Pac. (2d) 31] ; *Spinney* v. *Downing,* 108 Cal. 666 [41 Pac. 797].) This rule

has been applied in the case where a proposed lessee went into possession and made improvements pending negotiations for a written lease which was never executed, the court holding that because of the owner's express refusal to enter into a verbal lease, the occupancy by the proposed lessee vested no estate in him. (*Potter* v. *Mercer*, 53 Cal. 667.) Applying that principle to the facts of the present case, the occupancy of the land by Ryan and the appellants with the tacit permission of Jones and Legare amounted to no more than a license to occupy. ■ Appellants' contention that the findings are vulnerable because they fail to state that Ryan was a licensee has no merit. That was a legal deduction drawn from the facts found and, as such, was properly included in the court's conclusions of law.

■ The appellants also attack the court's conclusion that the license was revoked because, they say, it is not supported by the evidence. But the record shows that on or about the 14th of September, when the crop was being harvested, Legare ordered Clarke, Ryan and Ryan's foreman to stop hauling the corn away and that he then became involved in a fist fight with Clarke over the matter. These acts certainly amounted to a legal revocation of the license.

■ Construing the findings and conclusions in their entirety, there is no fatal inconsistency between the finding that Jones and Legare were in possession of the land "at all times herein referred to" and the conclusion that at the time of the revocation of the license Jones and Legare "went into possession and repossessed the said land". The evidence and findings as a whole are consistent with the legal fact of continued possession of the land by Jones and Legare. Legare and his wife lived on the land, and Ryan's permissive occupancy did not constitute legal possession. The language used by the court in describing Ryan's ouster certainly cannot be held to vitiate the judgment.

■ Appellants argue that assuming Ryan was a mere licensee, the license was irrevocable by reason of the expenditure of money and the performance of labor that took place during his occupancy, citing the case of *Stoner* v. *Zucker*, 148 Cal. 516 [83 Pac. 808, 113 Am. St. Rep. 301, 7 Ann. Cas. 704], which holds that one who permitted another to enter upon his land and construct an irrigation ditch at a cost of $7,000 could not thereafter revoke the license. But that decision was grounded upon the principle of estoppel, which

is inapplicable to the facts of the instant case. True, under other circumstances the tacit acquiescence of Jones and Legare in appellants' entry and conduct of farming operations might have been a sufficient representation on which to base an estoppel, but the acquiescence here was induced by and was referable to appellants' representations and assurances concerning rent. Jones and Legare demanded that the rent be guaranteed in order that payment of their obligation to the respondent bank might be assured, and the evidence shows that Clarke and his associates were keenly aware of this; indeed, as late as the day before Legare stopped the removal of the crop, Clarke told him not to worry about the rent; that the rent had been "fixed up with the bank". And it is uncontradicted that appellants entered upon the land in the face of Legare's express refusal to sign the lease because the guaranty had not been obtained.

Appellants' final contention is based upon the doctrine of marshalling. It is said that even if respondent had a lien upon the crop, it should have been required to resort first to the real property described in the contract of sale in order to satify its debt, so that appellants as junior lienholders could satisfy their claims out of the crop. (Civ. Code, secs. 2899, 3433.) This argument is untenable under the conclusions reached, because it assumes that appellants had a lien upon the standing crop. As licensees whose license had been effectively revoked, appellants had no interest in or lien upon the corn which stood unsevered at the time the receiver was appointed. Jones and Legare were entitled to it as owners of the land, and by its crop mortgage the respondent bank acquired a lien which it was entitled to foreclose.

The judgment is affirmed.

Shenk, J., Curtis, J., and Houser, J., concurred.

Rehearing denied.