[Sac. No. 5849. In Bank. Sept. 28, 1948.]

HENRY B. WOLFSEN et al., Respondents, v. W. L. HATH-
AWAY et al., Appellants.

L. M. Linneman and Linneman & Burgess for Appellants.

C. Ray Robinson and Margaret A. Flynn for Respondents.

SPENCE, J. — Plaintiffs brought this action to recover damages for the destruction of grass and grain growing on land leased by them for pasturage. The damages occurred as the result of some farming operations undertaken by defendants W. L. Hathaway and Seth Cole, claiming to have acted in reliance upon an oral agreement for the written lease of the land for farm cultivation. Upon the completion of the trial testimony and in response to plaintiffs' motion premised on the theory that there was no evidence validating the existence of said defendants' alleged oral agreement, the court "directed . . . a verdict in favor of [plaintiffs] on actual and compensatory damages," with the amount thereof to be fixed by the jury, but on the issue of "punitive damages" the court left "the question . . . entirely to the discretion of the jury," both as to the matters of allowance and amount. Thereupon the jury returned a verdict against each of said defendants for compensatory damages in the sum of $15,410, and against defendant W. L. Hathaway as "exemplary or punitive damages" the further sum of $15,000. From the judgment accordingly entered against them, defendants W. L. Hathaway and Seth Cole prosecute this appeal. The owners of the land were also named as codefendants in this action, but in pursuance of the court's instruction, the jury returned a verdict in their favor, judgment was so entered, and they are not parties to this appeal.

Appellants contend that the court erred in instructing the jury that respondents were entitled to damages in any sum

whatsoever, and claim that the assumed invalidity of appellants' alleged oral agreement for lease of the land involved, as premise for the directed verdict, is not supported by the evidence. They also argue that the amount of compensatory damages is excessive, and that there is no showing of actual malice to substantiate the award for exemplary damages. The record sustains appellants only as to the last proposition—the impropriety of the punitive damage assessment.

■ As an additional point, appellants question the constitutionality of the required joinder of "several parties on either side" of litigation in any challenge to jurors, whether peremptory or for cause. (Code Civ. Proc., § 601.) In this connection they argue that the owners of the land "were anything but adversaries to the plaintiffs" and that "their presence in the case as codefendants with" appellants interfered with the proper interposition of challenges on behalf of the defense, with the result that "appellants were in effect deprived of their right to trial by jury." But whether or not the designated codefendants had "conflicting" interests, the record shows that appellants secured a jury which was apparently satisfactory to them. There is thus no basis for their urging any prejudice or injury in the operation of the statute with respect to the procedural formality in their authorized exercise of "challenge to jurors" (see *National Sanitary Rag Co.* v. *Lawrence,* 33 Cal.App.2d 198, 200 [91 P.2d 120]), and the matter need not be considered further.

The record discloses these salient facts: Defendants Luis Fatjo, Lolita Fatjo Judge, Mary J. Fatjo and Paula Marie Fatjo, as a family unit, owned 1,740 acres of grazing and grain land situated in the county of Merced. On January 17, 1946, they executed a written lease of said land to respondents for a term of seven and one-half months commencing on March 15, 1946, for the cash rental of $7,500. Respondents leased the land "for the purpose of conducting therein the grazing of cattle and the harvest of volunteer grass and grain." They took possession as scheduled under the terms of their lease. Appellants, by their separate answer to the complaint and at the trial, claimed that "on or about the 15th day of December, 1945," the owners of the land, through their agent, C. J. McCullough, "entered into an oral agreement with defendant W. L. Hathaway . . . to lease and demise and agreed to enter into a [subsequent] written lease for the purpose of leasing and demising to" him said land, for a term of tenancy "to commence forthwith"

and "to expire on the 30th day of June, 1947," in consideration of one-fourth of the crop of grain produced, to be delivered to the lessors as rental therefor; that the written lease [which was never executed nor delivered] "should contain substantially the same terms and conditions in addition to the foregoing terms and stipulations as were contained in a certain lease executed . . . under date of November 1, 1941, to one Thomas Hauschildt"; that pursuant to said oral agreement, "defendant W. L. Hathaway entered into [immediate] possession of the land" and "plowed and disced certain portions" thereof; and that "defendant Seth Cole" was "the agent and employee of defendant W. L. Hathaway" and worked "in cooperation and conjunction with" the latter on said land. The lessee Hauschildt had died during the term of his tenancy and "without formal assignment or assumption of the lease," appellant Hathaway "took [it] over" and "harvested the grain in the summer of 1945," but he had "no further right" on the land after he had done that job as successor to Hauschildt and any subsequent rental arrangement was "an entirely new matter." However, appellant Hathaway in "December of '45," at the time of the alleged oral agreement for his lease of this land, was "operating" a "farming field" of approximately the same acreage "directly across the highway" and belonging to the same owners.

McCullough was acting as agent for the real estate firm which handled the various transactions connected with the numerous realty holdings of these particular owners in the vicinity. The evidence is undisputed that no written lease of the property here involved was executed between appellant Hathaway and the owners. However, on January 8, 1946, appellant Cole commenced plowing the land and so continued until about noon of the next day when there was a breakdown of the machinery. Meanwhile McCullough, having received a telephone message from respondent Henry Wolfsen that "there was some plowing being done upon [the] premises," telegraphed to appellant Hathaway under date of "January 8 P. M." as follows: "There is some uncertainty if owners will approve farming field arrangement. Do not disk or plow until we communicate with you again." Receiving the telegram the next morning, January 9, appellant Hathaway went to the premises that afternoon "between one and two o'clock," found appellant Cole "fixing [the] plow" and told him that "McCullough . . . wanted [them] to stop for a

few days." Then on January 18, 1946, McCullough notified appellant Hathaway by letter as follows: "As the writer mentioned to you, the Fatjo family have decided not to farm the south field [the land here involved] this year, and instead have leased it for grazing purposes. Will you please be sure that your foreman knows of this and that he does not by mistake do any more plowing. The writer understands that before the foreman was properly informed he had plowed about 40 acres." Two or three weeks thereafter appellant Hathaway took up the matter with his attorney, who told him that he "had a legal and enforceable [oral] lease" of the property. The attorney accordingly on February 19, 1946, wrote to McCullough that appellant Hathaway was "relying in good faith . . . upon the oral agreement" as entitling him "to the possession of the property," that he had "embarked upon the performance of the lease," and that he would appreciate hearing from McCullough "on the subject" after the latter had communicated with his "principals." On February 26, McCullough advised appellant Hathaway's attorney by letter that "there was no agreement, oral or otherwise, with Mr. Hathaway," that "we do not recognize any right in Mr. Hathaway to possession of the property," and that "the field as we informed Mr. Hathaway has been leased to another for grazing purposes."

Following this exchange of letters in February, 1946, and toward "the latter part of" the month or "the 1st of March" appellant Cole, upon instructions from appellant Hathaway, resumed farming operations on the property and began to disk the land. While he was so proceeding and on March 5, 1946, respondent Henry Wolfsen went to the field and told appellant Cole that respondents "had a lease on the property," warned him "to quit disking" and not to destroy "the feed" or "there was somebody going to pay some damages for it." Thereafter, and "on the evening of the 7th of March," a restraining order was served on appellants, and they undertook no further farming operations on the property, but by that time some 635 acres of the grazing and grain land had been plowed and disked.

As a preliminary point, respondents cite a judgment which was rendered in a former action brought by the owners of the land against these appellants—wherein it was determined that Hathaway did not hold the oral lease claimed in this suit, that neither he nor Cole had the right to disk, plow or **destroy the crops of grass or grain growing on the property,**

and an injunction was issued accordingly against their continuing such activity—as res judicata of those issues in this action. It is true that such suit was filed on March 7, 1946, in which those precise issues were resolved against the defendants Hathaway and Cole; that from the judgment entered in disposition of the matters so litigated, defendants appealed to the District Court of Appeal, Third Appellate District, and that "pursuant to request," their appeal was dismissed on March 26, 1947. (*Fatjo et al.* v. *Hathaway et al.*, 3 Civ. No. 7349, 78 A.C.A. No. 6, Minutes, p. 4.) ▮ It is also true that since appellants in their answer in this case set forth as a separate defense the alleged oral lease of the property in justification of their "farming operations" thereon, and respondents therefore had no opportunity to plead the prior adjudication, that plea was not a prerequisite to respondents' right to interpose proof of the former judgment as an estoppel against the attempt of appellants to relitigate the same issues. (Code Civ. Proc., § 462; 21 Cal.Jur., § 113, p. 163.) But the record in this case contains no proof of respondents' reliance upon the former judgment as res judicata. While in the course of cross-examination of appellant Hathaway, certain relevant portions of his testimony in the former action were cited, such references were made only for the purpose of impeachment. ▮ It has been uniformly held that in the absence of either pleading or proof of a former judgment upon litigated issues, the defense of res judicata is thereby waived in the subsequent action. (15 Cal.Jur., § 233, p. 214; 50 C.J.S., § 822, p. 389; *Domestic & Foreign Petroleum Co., Ltd.* v. *Long,* 4 Cal.2d 547, 562 [51 P.2d 73]; *Rideaux* v. *Torgrimson,* 12 Cal.2d 633, 638 [86 P.2d 826]; *Spitzer* v. *Superior Court,* 74 Cal.App. 494, 498 [241 P. 270].) ▮ Nor can respondents avail themselves of the principle of judicial notice in support of their present plea of the former adjudication. It is the general rule that "the court will not take judicial notice of other actions, not even those pending or concluded in the same court." (*Johnston* v. *Ota,* 43 Cal.App.2d 94, 96 [110 P.2d 507]; see, also, 10 Cal. Jur., § 52, p. 727; *Stanley* v. *McElrath,* 86 Cal. 449, 457-458 [25 P. 16, 26 P. 800, 10 L.R.A. 545]; *Bank of America National Trust & Savings Assn.* v. *Button,* 23 Cal.App.2d 651, 653 [74 P.2d 81].) The authority of a court to take judicial notice of its own records "is limited to proceedings in the same case." (*Sewell* v. *Price,* 164 Cal. 265, 273 [128 P. 407].)

However, there does not appear to be any substantial evidence in this case that appellant Hathaway held a valid oral lease on the land as the basis for undertaking the farm work in question. The alleged oral agreement to lease the land was invalid, under subdivision 4 of section 1624 of the Civil Code, for it purports to be "an agreement for the leasing for a longer period than one year." It was claimed to have been made on December 15, 1945, and that it "was to expire on the 30th day of June, 1947." The statute provides that such an agreement is "invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent." No such memorandum was signed. It seems evident from a reading of the record that appellant Hathaway had a conversation with McCullough, the real estate agent, in December, 1945, regarding a proposed lease of the land. As above stated, the property had been formerly leased to Thomas Hauschildt —for five years, running from November, 1941—but when he died in 1945, appellant Hathaway "just stepped in there and did Tom Hauschildt's job," harvesting "the grain in the summer of 1945" on the "basis which Hauschildt operated, three-quarters to the tenant and one-quarter to the landlord." As appellant Hathaway himself testified, his contemplated lease of the property was to be on a "crop share" arrangement "*along the line* of the Hauschildt lease," upon terms to be thereafter agreed upon and executed between the owners of the land and himself. In that regard he testified: "Q. You understood then that this lease was to be signed by the owner of the property, didn't you? A. That is right. . . . Q. You understood by that that he wanted a signed lease in order to complete the deal, isn't that right? A. Yes."

It is true that on January 2, 1946, following their discussion of terms some two weeks earlier, McCullough prepared and sent to appellant Hathaway a proposed written lease for the latter's approval and signature. It was not signed by the owners. The prompt delivery of that proposed written lease by McCullough demonstrates that the parties' rights were not to depend upon any oral rental arrangement but rather were to stem from a written agreement to be thereafter executed by them. McCullough had no authority as an agent of the owners or otherwise to make an oral lease of the property or to agree upon the terms of the proposed written lease with appellant Hathaway. He so testified. There is absolutely no evidence

in the record that McCullough had or claimed any such authority, and no basis for appellant Hathaway to insist their dealings would warrant any other conclusion. To this point appellant Hathaway testified that McCullough told him "he was going to *take the bull by the horns* and go ahead with this arrangement with me on the property." Such statement clearly inferred that McCullough had no authority to lease the property orally or otherwise. It is true that McCullough appreciated the urgency of completing the arrangements so that the farm work could proceed "in the immediate future." Accordingly, in his letter of transmittal to appellant Hathaway, McCullough stated that "it is essential that we consummate this lease as quickly as possible as the time is close at hand for doing the summer fallow work" and he asked Hathaway, "as a means of saving time," to "call [him] on the phone at our expense" with regard to any questions. But such communication, which appellant Hathaway claims to have interpreted as meaning that he was to proceed with his farming operations "under the agreement at once," on its face does no more than confirm McCullough's steadfast position that the commencement of the work was to await the execution of the written lease, with the matter receiving the parties' "earliest attention." Moreover, appellant Hathaway admitted that he read the proposed written lease which he received from McCullough and signed it, notwithstanding the fact that it contained some provisions with which he did not agree. Such execution followed his phone call to McCullough sometime between "January 3rd" and "January 5th." Regarding the variances in the proposed lease, which admittedly contained "clauses . . . that . . . had not even [been] discussed" in the preliminary oral negotiations with McCullough, appellant Hathaway testified: "We had not arrived at all the details of the lease, the agreement was I believe I testified to in discussing this with Mr. McCullough over the phone, and he told me to go ahead and sign this lease and shoot it up to him, that he and I would get together on some of the details later. . . . I have had no conversation with Mr. McCullough since the phone call that I made." On January 8, 1946, two days after returning the signed lease to McCullough, appellant Hathaway sent his foreman Cole upon the land to commence the plowing work above mentioned though admittedly neither then nor at any time thereafter was there "a final determination of the terms and provisions of the contemplated lease between [him-

self] and the Fatjo heirs." With the ultimate settlement of the leasing conditions so pending, appellant Hathaway acquired no right to possession of the land by virtue of the preliminary negotiations which had not yet been "reduced to writing" satisfactory to the parties (*Pacific Coast Joint Stock Land Bank of San Francisco* v. *Jones,* 14 Cal.2d 8, 14 [92 P.2d 390, 123 A.L.R. 695]), and he entered on the property "at his peril." (*Linnard* v. *Sonnenschein,* 94 Cal.App. 729, 735 [272 P. 315].)

Appellant Hathaway admitted that he had received the letter from McCullough, dated January 18, 1946, notifying him that the property had been leased "to other persons for grazing purposes" and returning the proposed lease theretofore signed by appellant, with the statement that it had been rejected by the owners in line with their decision "to not farm the . . . field [that] year." As heretofore mentioned, 10 days prior to that letter—on January 8—McCullough telegraphed appellant Hathaway to "not disk or plow [the land] until we communicate with you again." Likewise, as above recited, appellant Hathaway had McCullough's letter of February 26, 1946, stating that he "had no lease on the property." Nevertheless, appellant Hathaway instructed his foreman Cole "around the [end] of February" to "get the equipment ready and move it over onto the property to start disking." After such operations had proceeded for a few days and on March 5, respondent Henry Wolfsen saw appellant Cole working on the land, told him that respondents had leased the property, and warned him not to destroy the crops. In reply, appellant Cole said that he "wouldn't stop because I just take orders from one man [appellant Hathaway]." Accordingly, appellants continued the farming work, which they had undertaken about "the 1st of March," until March 7, when the restraining order was served upon them, and committed during that period substantially all the damages subject of this suit. In line with this review of the record, there appears to be no evidence in this case that appellants held an oral lease or that they were lawfully entitled to enter upon the property and disk or plow the land and destroy the crops thereon. The court therefore properly instructed the jury to that effect. (*Galiano* v. *Pacific Gas & Electric Co.,* 20 Cal.App.2d 534, 538-539 [67 P.2d 388].)

Appellants contend that the alleged oral agreement to lease was not invalid under section 1624 of the Civil Code,

regardless of the fact that it was "for a longer period than one year," for the reason that they entered upon the property and performed some work in partial performance of the agreement. (*Schubert* v. *Lowe,* 193 Cal. 291 [223 P. 550] ; *Manning* v. *Franklin,* 81 Cal. 205 [22 P. 550] ; *Cheney* v. *J. R. Newberry & Co.,* 67 Cal. 125 [7 P. 444].) The cited cases do not appear to be in point. None of them involves, as does the present action, the wrongful entry of real property by defendants under an "invalid" oral agreement and the destruction of growing crops thereon, after notice of the invalidity of their claim, and of the fact that the land had been leased to other persons. As the above recital of the record in this case establishes, the owners of the land indisputably refused to execute the proposed lease in favor of appellants and consistently disclaimed any rights of possession accrued thereunder, so that the acts of appellants could not possibly be construed as done in "part performance" thereof—that is "done [not only] 'in pursuance of the contract, and with the design of carrying the same into execution [but also] with the consent and knowledge of the other party.' (*Foster* v. *Maginnis,* 89 Cal. 267 [26 P. 829].)" (*Fritz* v. *Mills,* 170 Cal. 449, 458 [150 P. 375].) In accord, see *Stark* v. *Byington,* 21 Cal.App.2d 642, 648 [69 P. 2d 995].

■ There is no merit to appellants' objection to respondents' prosecution of the present action for damages because they admittedly were not in possession of the property, nor entitled thereto under the terms of their lease, at the time of appellants' performance of the main "disking operations," which commenced about "the 1st of March" and terminated on March 7, 1946, as the result of the issuance of the restraining order above mentioned. Appellants rely upon the general rule correlating the maintenance of an action for injury to land, under the common-law concept of trespass *quare clausum fregit,* with the right to actual or constructive possession of the premises when the trespass was perpetrated. (24 Cal.Jur. § 22, p. 680 ; 63 C.J. § 20, pp. 903-904 ; *Taylor* v. *Terry,* 71 Cal. 46, 47-48 [11 P. 813].) Accordingly, they argue that the owners of the land were the proper parties to complain of appellants' alleged wrongful acts committed prior to the date of the commencement of respondents' lease, March 15, 1946, and that respondents' claim of damages against appellants is unsupportable. (*Risco* v. *Reuss,* 45 Cal.App.2d 243, 244 [113 P.2d 914].) But appellants mistake the theory of respondents'

pleading—analogous to the common-law action of case—upon the premise that appellants' destruction of the growing crops amounted to an invasion of respondents' future possessory interest under their presently existing and valid lease. Thus, by the lease which respondents concluded on January 17, 1946, with the owners of the land, on a cash rental basis of $7,500— of which "$3,750" was paid "upon the execution of the lease and $3,750 on May 1st, 1946"—respondents obtained the right to claim possession of the grain crop which was then growing on the land and which they deemed essential to the leasing arrangement between the parties. So respondent Henry Wolfsen stated at the trial that "when . . . negotiating with Mr. McCullough in connection with [the] pasture," he said "that without that privilege [to mow and harvest the field he] couldn't afford to pay anywhere near the $7,500 for the" property. McCullough confirmed this statement, and the lease was made on that basis—thereby vesting in respondents a future possessory interest in the property, including the growing crops. In line with this view is the testimony of respondent Henry Wolfsen to the effect that when he saw appellant Cole working on the land on March 5, 1946, "I told Mr. Cole that I had a lease on the property, that I wanted them to quit disking, and the feed was mine, and if they tore it up that there was somebody going to pay some damages for it."

The right to harvest the grain crop was an integral part of respondents' lease and as early as January 18, 1946, appellants had notice that the property had been leased "to other persons for grazing purposes," so that any plowing or disking operations would necessarily injure the land insofar as concerned the announced purpose of pasturage. In such circumstances there can be no doubt that appellants' subsequent destruction of the growing crops constituted an invasion of respondents' rights under the terms of their lease, depriving them of benefits thereby conferred, and they are entitled to pursue their remedy against appellants as the persons by whom the acts were committed. (Cf., *Playter* v. *Cunningham*, 21 Cal. 229, 233; *Rogers* v. *Duhart*, 97 Cal. 500, 503-505 [32 P. 570].) While the owners of the land were named as codefendants in this action—so that all parties to the controversy would be before the court (Code Civ. Proc., § 379c) and circuity of action would be obviated—the record indisputably establishes that they at no time acquiesced in appellants' tortious conduct but, immediately upon learning thereof, acted in protection of

respondents' rights under the lease. Accordingly, the court concluded that respondents had no cause of action against the owners of the land and directed a verdict in their favor. But as "the real party in interest" (Code Civ. Proc., § 367), sustaining the loss occasioned by appellants' acts in destroying the growing crops on the land, respondents' claim of redress from appellants cannot be denied. (Civ. Code, § 3520; cf., *Playter* v. *Cunningham, supra,* 21 Cal. 229, 233.) The propriety of an action for damages to property by one who is not in possession or entitled to possession at the time of its injury has been recognized in this state under varying factual circumstances (*Easton* v. *Ash,* 18 Cal.2d 530, 539 [116 P.2d 433]; *Southern Pacific Land Co.* v. *Kiggins,* 110 Cal.App. 56, 61 [293 P. 708]; *Rhoda* v. *County of Alameda,* 134 Cal.App. 726, 732-733 [26 P.2d 691]), and the present case illustrates another type of situation where fundamental principles of right and justice would so require. (Civ. Code, § 3523.)

However, as a further consideration with regard to respondents' recovery, appellants, for the first time on appeal, challenge the measure of damages adopted at the trial of this case. They rely on the distinction drawn between the wrongful destruction of perennial crops, such as volunteer grass for grazing purposes, and annually planted crops. Thus, in the former case the proper measure of damages is the difference in the rental value of the property with and without the crops (*Miller & Lux, Inc.* v. *Pinelli,* 84 Cal.App. 42, 47-51 [257 P. 573]; *Maddalena* v. *LeDuc,* 29 Cal.App.2d 211, 212 [84 P.2d 254]), while in the latter case the proper measure of damages is the market value of the estimated product at the time of destruction, less the cost of producing and marketing the same. (8 Cal.Jur. § 76, p. 819; 25 C.J.S. § 85b, p. 610; *Fay* v. *Cox,* 45 Cal.App. 696, 701-702 [188 P. 623]; *Dutra* v. *Cabral,* 80 Cal.App.2d 114, 119-120 [181 P.2d 26].) Here the destruction of both volunteer grass and grain is involved. The evidence shows that respondents wanted the land for feeding their cattle upon both the volunteer grass and the stubble and uncut grain which remained on the property. But the lease also gave them the right to "harvest [the] volunteer grass and grain," and it indisputably appears that they insisted on this "privilege" as a condition to their rental of the land at the agreed sum. Accordingly, evidence of the market value of the grass, less the cost of cutting and hauling it to market, was adduced by respondents from expert witnesses without the objection of ap-

pellants. In fact appellants cross-examined the witnesses on the theory that was the correct measure of damages—$25 per ton at an estimated yield of 1 ton per acre for the minimum 635 acres disked by appellants, whether gauged as "hay baled" or "hay in shocks" in the field for feed—rather than a computation on the basis that such percentage of the cash rental figure, $7,500, as reflected the proportion of the total acreage destroyed "for grazing purposes," would determine the actual damage sustained.

So pertinent is the case of *Staub* v. *Muller*, 7 Cal.2d 221 [60 P.2d 283], wherein evidence of the value of damaged alfalfa was established by showing the market value of the crop destroyed, as was done here. "No finding of damage to the freehold was made" and "the award covered but one element of damage, i. e., injury to the crop." (P. 227.) "No evidence was adduced as to rental value of the land and no foundation was laid for measuring the damages by the rule which appellant now asserts should have been invoked, that is, that the measure of damages was the difference in rental value of the property with and without the crop thereon." (P. 228.) After noting the "distinction between the proper measure of damages for the destruction of a perennial crop, such as alfalfa, and the measure for destruction of such crops as vegetables and grain, which require annual planting," and stating the "question . . . [to be] one presenting so many phases and conditions which may affect the result one way or another, that, even aside from the conflict of opinion among the decisions, it is practically impossible to formulate a general rule by which all cases may be governed," (p. 228), this court finally concluded at page 229, as follows: "Notwithstanding the conflict of authority and the difficulty of estimating damages in these cases, the decisions are in complete agreement upon one proposition and that is, that *'compensation for the real injury is the purpose of all remedies.'* (Citing authorities; emphasis added.) From the record in this case we cannot but conclude that the court, in fixing the damages, named an amount which, as nearly as it is possible to ascertain, will fairly compensate plaintiff for the actual injury suffered." Accordingly, it was said at page 230 that "the judgment as rendered should stand."

Pursuant to the state of the record prevailing in this case on the issue of damages, the jury, at the request of appellants, was instructed as follows:

"Compensatory damages are such damages as will reasonably compensate the person injured for the detriment suffered by him. In awarding compensatory damages, no jury has the right to award any amount in excess of such sum as will reasonably compensate for the damage actually sustained, but in this connection you are instructed that it is not the purpose of the law in permitting compensatory damages to permit any plaintiff to realize a profit by way of award of compensatory damages."

"I instruct you that the measure of damages for the destruction of a growing crop is the value of the crop in the condition it was in at the time and place of destruction."

It is true that at the request of respondents, the jury was further charged as follows:

"In determining any such value of a growing crop, it is proper for you to determine and take into consideration the probable yield and market value thereof and deduct therefrom the cost of producing and marketing the same and in determining these matters, it is also proper for you to consider the kind of crops so injured or destroyed, the average yield per acre of such crops on the land where not so injured or destroyed and on other similar lands in the immediate neighborhood cultivated in like manner, the stage of growth of such crops at the time of any such injury or destruction, the expense, if any, of cultivating, harvesting and marketing such crops, and the market value of such crops at the time of maturity or within a reasonable time after any such injury or destruction."

But such last-quoted instruction only added the qualifications coincident with the rule for measuring damages under appellants' own theory of assessment in the case of the growing crops here involved. These matters were all fully covered in the course of examination and cross-examination of respondents' witnesses, and the propriety of their consideration in the event of a damage award in favor of respondents was in nowise questioned by appellants. In short, the testimony on the subject all went to the point of market value of the grass or hay in the light of cost of replacement to respondents for feed of their cattle. Appellants may not now complain of the method of proving the amount which would compensate respondents for their loss of crops, pursuant to section 3333 of the Civil Code, since that evidence was admitted without objection and was the apparent theory of the measure of damages upon which

the case was tried in an effort to determine upon an award which would "fairly compensate" respondents "for the actual injury suffered." (*Staub* v. *Muller, supra*, 7 Cal.2d 221, 229.)

 Under the circumstances, the evidence adequately supports the amount of compensatory damages fixed by the jury.

 There now remains the question of the evidentiary basis in this case for an award of exemplary damages against appellant Hathaway. In a tort action "where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." (Civ. Code, § 3294.) But "the malice, and the only malice, contemplated by section 3294 is malice in fact, and . . . the phrase 'express or implied' has reference only to the evidence by which that malice is established; express malice thus meaning that the malice is established by express or direct evidence going to prove the actual existence of the hatred and ill-will; implied malice referring to the indirect evidence from which the jury may infer the existence of this malice in fact. . . . It is in those cases where the defendant has been guilty of oppression or fraud, or of a malice akin to oppression and fraud, that punitive damages may be awarded. But throughout the whole history of the law, whatever may be the mode of proving the existence of malice in fact, it is only upon some showing regarded by the law as adequate to establish the presence of malice in fact, that is the motive and willingness to vex, harass, annoy, or injure, that punitive damages have ever been awarded. And this, the adjudications abundantly and without controversy establish.

"When consideration is paid to the fact that *the sole object of an action at law is to return full compensation in terms of money for a legal wrong inflicted upon a plaintiff*, and where in any action a plaintiff has been made whole, in contemplation of law, by the receipt of such an award in damages, it is indeed an anomaly to find that in any case more than full compensation may be awarded him. And it is well said in *Haines* v. *Schultz*, 50 N.J.L. 481 [14 A. 488], that 'the engrafting of this notion (punitive damages) into personal suits has resulted in an anomalous rule; the doctrine of punitive damages being a sort of hybrid between a display of ethical indignation and the imposition of a criminal fine, but, whether we regard it in one light or the other, it is the wrongful personal intention to

injure that calls forth the penalty.' '' (*Davis* v. *Hearst*, 160 Cal. 143, 162 [116 P. 530] ; emphasis added.)

In line with this authoritative statement of the law, these matters disclosed by the record are significant. A major portion of the disking operations, which were commenced on the land about ''the 1st of March'' and which caused the principal damage subject of this action, was done without appellants' knowledge of the identity of respondents as the lessees. As above noted, respondent Henry Wolfsen testified that March 5 was the day when he informed appellant Cole that respondents ''had a lease on the property'' and that appellants should ''quit disking'', thereon—indicating that until that date appellants did not know who was claiming the land and correlating with appellant Hathaway's testimony that at the time (the end of February) he ordered his foreman Cole to ''get the equipment ready and move it over onto the property to start disking,'' he ''did not know who had the lease on the property.'' The various communications from the real estate agent McCullough to appellant Hathaway with reference to the leasing arrangements for the property had carefully omitted the name of any lessees, but had merely stated that it had been leased ''to other persons'' or ''to another.'' It is true that appellants continued the disking operations on the land until March 7, when the restraining order was served upon them, but the nature of the work as performed after March 5 was in nowise different from that performed prior thereto, when appellants did not know the identity of the lessees. In short, the whole tenor of appellants' operations indicated their intent to work the land beneficially in pursuance of their claim to possession thereof following the terms of the alleged oral agreement with McCullough as representing the owners of the property—and regardless of the identity of any other persons claiming as lessees. Accordingly, appellants were anxious to prepare the premises for the crop planting, and they undertook early in the year farming operations directed to that end. While the plowing and disking necessarily involved turning over the land and destroying any volunteer grass and grain growing thereon insofar as concerned their use for stock feed, such procedure was wholly consistent with recognized methods of good husbandry, gauged to enhance the fertility and productivity of the soil, and reflected appellants' belief that they had the right to so proceed as lessees of the field for farming purposes.

As stated in the foregoing review of the record, appellant Hathaway, upon the death of the former lessee of this particular land, "just stepped in there," harvested "the grain [growing thereon] in the summer of 1945," and carried out the crop share agreement which the deceased lessee had undertaken with the owners of the land. Although such informal arrangement admittedly gave said appellant no further right on the property after the completion of that summer's harvesting, his apparently satisfactory farm work thereon undoubtedly prompted his negotiations with McCullough for the right to lease the land upon the crop share basis theretofore prevailing and at a time when he was "operating" a "farming field" of approximately the same acreage "directly across the highway" and belonging to the same owners—circumstances supporting said appellant's claim of his desire to coordinate his farm program in the two fields. The first plowing on the land here involved was on January 8, 1946, "within two days" after appellant Hathaway had signed and returned the proposed written lease to McCullough and "in reliance upon [that] fact" following the telephone call to McCullough regarding some of the terms thereof. That plowing was stopped the next day upon appellant Hathaway's receipt of McCullough's telegram stating that there was "some uncertainty" as to whether "the owners" would "approve" the previously discussed "farming field arrangement" and requesting that no more disking or plowing be done on the land until further communication. The farm work was not resumed until "around the . . . 1st of March," following appellant Hathaway's full disclosure of the situation to his attorney and the latter's advice that said appellant "had a legal and enforceable [oral] lease." Accordingly, and in reliance upon such legal advice, confirming his own belief as to his rights in the matter, appellant Hathaway continued with the plowing and disking operations on the land until restrained by the court order, and the identity of the lessees—whether respondents or some other persons—as disclosed some three or four days after the resumption of the farm work appears to have had no bearing on the matter. While the attorney's advice was erroneous, as the situation has been heretofore discussed, it is clear that appellants' operations constituted acts of good husbandry performed under a claim of right to possession of the property. (See 25 C.J.S. § 123e, p. 727.)

Respondents argue that appellant Hathaway's persistent course of action is chargeable to the fact that certain ill-will developed between them and appellant at the time of their joint operation of this particular land in 1945, when respondents had contracted for the stubble for the feed of their cattle and appellant was then engaged in harvesting the grain crop in the place of the former lessee. It seems that within some 10 days four "mysterious" fires occurred on the premises during such period of joint operation and a considerable portion of the acreage—with both stubble and grain thereon—was burned. The cause of the fires was undetermined, but the record shows that respondents protested their repeated happening to appellant Hathaway, and there was a somewhat heated exchange of words between the parties indicating their anger over the situation resulting in their mutual loss. However, be that as it may, appellant Hathaway's procedure here appears to have had no relation to the prior dispute since he did not know the identity of respondents as the lessees at the time he undertook what he considered "performance of his oral agreement" for the lease of the land and his actions thereon were in nowise changed when he learned, after a substantial portion of the plowing and disking had been done, that respondents were in fact the persons claiming as lessees of the property. Respondents suggest that appellant Hathaway might easily have "suspected" that they were the lessees, as he knew that they had cattle in the area and would want land "for grazing purposes," but the record does not show that appellant did, in fact, have such knowledge until his foreman was so informed by respondent Henry Wolfsen on March 5, 1946. ▆▆▆ An award of punitive damages may not be based upon mere speculation, but rather such penalty depends upon a definite showing of a "willingness to vex, harass, annoy, or injure . . . '[consistent with] the wrongful personal intention to injure.' And this is necessarily so, for the law, having made full compensation for the *act,* can thereafter be concerned solely with the *motive* of the act. The wrongful act has been redressed by full compensation. The improper motive which actuated it may be punished by an award of exemplary damages." (*Davis* v. *Hearst, supra,* 160 Cal. 143, 162; see, also, 8 Cal.Jur. §§ 107-108, pp. 864-866, and cases cited.)

▆▆▆ Since the record indisputably shows that appellant Hathaway's tortious acts upon the premises in question stemmed not from any "malice in fact," but wholly from a

mistaken claim of right under the belief that his "oral lease" was valid and enforceable, the "wrongful personal intention to injure" that calls forth the penalty of punitive damages was not established and the court erred in submitting the matter of such award to the jury. In view of this conclusion as to the insufficiency of the evidence to support a recovery of exemplary damages, the opposing arguments of the parties as to the propriety of the instructions on the subject or the excessive amount of the award need not be discussed.

The judgment is modified by reducing it in the sum of $15,000, being the amount which was awarded as exemplary damages, and as so modified, the judgment is affirmed. The parties will bear their own costs on this appeal.

Gibson, C. J., Shenk, J., Edmonds, J., and Traynor, J., concurred.

CARTER, J.—I dissent.

In my opinion the determination of the jury and the trial court allowing the plaintiffs exemplary damages should be affirmed. The existence of malice requisite to the allowance of exemplary damages is always a question for the jury; it must always be submitted to them to find whether it existed. As the question of maliciousness, wilfulness or wantonness with which the act was done is left to the jury, its determination that the defendant acted maliciously should be affirmed. The jury sees and hears the witnesses, and it necessarily follows that whether or not the witness appears to be telling the truth, his manner of giving the testimony, and his credibility in general is for the jury. Whether his testimony is believed is for the jury's determination, as are the inferences to be drawn therefrom. In this case, the jury allowed the respondents compensatory damages for the loss of their grazing land and the grain and grass growing thereon and, punitive or exemplary damages. Since punitive damages are those awarded for the purpose of punishment, and for the purpose of setting an example to others, and are only awarded where the actor is motivated by malice, or is guilty of fraud or oppression, the jury must have so found in this case.

The Civil Code, section 3294, provides that in a tort action "where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

Malice, other than constructive malice or malice implied in law, is of two kinds, express or implied. Express malice does not mean, necessarily, malice expressed in words, but is defined to be the doing of a wrongful act with a sedate and deliberate mind and formed design, and, being a mental condition and not ordinarily susceptible of other kinds of proof, it may be evidenced by the external circumstances attending the execution of the act. It has been held that there is no difference in the nature or degree of the malice intended, whether it be called express or implied, when these terms are used in their most appropriate sense, and that, if properly applied, they refer only to the *evidence* by which the existence of malice is established. Malice of any kind must be inferred, because it consists in a quality or state of the mind, either actual or imputed. Its actual existence may be manifested by external circumstances, from which it may be reasonably inferred, in which event it is *express.* In the absence of those external circumstances which make it manifest, it is in some cases imputed as a legal inference, without reference to whether it exists in fact or not, in which event it is said to be implied—malice *implied in law. Malice in fact* implies a desire and an intention to injure.

The word "malicious" within the rule as to punitive damages means the intentional doing of a wrongful act without just cause or excuse, and does not require the act to have been done in spite or ill will. (*Robbs* v. *Missouri Pac. Ry. Co.,* 210 Mo. 429 [242 S.W. 155].)

"In actions of trespass, where the injury has been wanton and malicious, or gross and outrageous, courts permit juries to add to the measured compensation of the plaintiff, which he would have been entitled to recover had the injury been inflicted without design or intention, something farther by way of punishment or example, which has sometimes been called 'smart money'. This has always been left to the discretion of the jury; as the degree of punishment to be thus inflicted must depend upon the peculiar circumstances of each case." (Sedgwick on Damages (9th ed.), § 352, quoting from *Day* v. *Woodworth,* 13 How. 363 [14 L.Ed. 181].)

"Malice, in respect to exemplary damages, does not consist of personal hatred, ill will, or animosity. It consists of a state of mind that is reckless in its nature and implies a determination to do a thing regardless of legal rights or for the purpose of inflicting an injury. True, it may be motivated by personal ill will, hatred, or animosity, but unless the

wrongful act proceeds from the malice and is done deliberately and in disregard of legal rights or in an effort to gratify passion engendered by hatred or ill will, the latter becomes immaterial in so far as exemplary damages are concerned." (*Lusk v. Onstott*, (Tex.Civ.App.) 178 S.W.2d 549, 554.)

This court said, in *Gudger* v. *Manton*, 21 Cal.2d 537, 543 [134 P.2d 217] (a slander of title case) that: "There has been considerable confusion and lack of rationalization flowing from the use of the term malice. It arises chiefly from the failure to clearly distinguish between malice implied in law and actual malice. The former is a mere legal fiction, while the latter denotes ill will *or the desire to do harm for the satisfaction of doing it or conduct which in effect amounts to the same thing.*" [Emphasis added.] Since it would be a very rare case indeed when a defendant would admit, in an action of this kind, to a "feeling" of spite or ill will or hatred toward a certain person, or admit that he did a wrong for the sheer satisfaction of doing it, it is necessary to consider the circumstances surrounding his allegedly malicious acts. From such circumstances the trier of fact may infer that the defendant was actuated by malice in fact, which is *either* a feeling of spite or ill will toward the plaintiff *or* an act done in wilful violation of a known right of another.

An examination of the record in the instant case and a chronological outline of the facts show that the defendant acted wilfully and in wanton disregard of the rights of another person. He knew of the *existence* of that other person, although he may not have known his name. It cannot be seriously contended as material to the issue of malice whether or not that person's name was Smith, Jones or Wolfsen. If I kill another's horse, his cow, or demolish his house or his automobile just because they are not mine or because I do not want him to have them when I am unable to have the same things, can it be said that I have not acted maliciously? Have I acted less maliciously, or without malice, just because I am not aware of his name, but only that he owns these things and I do not? The defendant knew that the land was leased to someone other than himself; he knew, when he acted, that he was not to have a lease on the land; he knew that his own signature on the proposed lease was not sufficient to give him any rights unless the owners' signatures were also on it. These things he admitted at the trial.

An examination of the record discloses that on December 15, 1945, an agent of the owners of the land entered into oral negotiations for the lease of the land to the defendant. This was reduced to writing sometime in January, 1946, and was sent to the defendant for his signature together with a letter asking him to sign the lease and informing him it would be *forwarded for the signatures of the owners.* Defendant knew that these signatures were never obtained, yet on January 8th and 9th, 1946, the defendant entered on the land and started "disking" it. He stopped on January 9th, because of a breakdown of the necessary machinery. On *January 9th,* 1946, the defendant received a wire from the agent which informed him that there was uncertainty as to whether the owners would lease the land to him. He was further told *not* to disk or plow the land. On the same day he received a letter confirming the telegram. A letter dated *January 18th,* 1946, written by the agent, and admittedly received by the defendant, informed him that the land had been leased to other persons. Despite these letters and the telegram, the defendant wilfully entered upon the land and started plowing and disking *on March 1st, or the latter part of February.* During this time, the plaintiffs notified the defendant that the property was leased to them, and that he was to stop his operations. On *March 7th,* 1946, a court order to desist was served on the defendant and his servant. But before he did desist, he had succeeded in disking some 635 acres of the land leased by the owners to the plaintiffs. The defendant admitted that even after the trial, and up until the 5th day of June, 1946, he continued to try to get on the land to continue his operations.

The actions of the defendant, with knowledge that he was not to have a lease on the land, and the further knowledge that it was leased to someone else, clearly imply a wilful and wanton disregard for the rights of others, and a determination to carry out his own purposes to the detriment of the legal rights of those others. By his actions he rendered the land completely useless for the purpose for which the plaintiffs intended to use it, although, as the majority say, it may have been good *farming* practice. It certainly cannot be denied that what is good farming practice may also render land absolutely without value for cattle grazing purposes; and that if land is disked or plowed, it would be impossible to harvest that year's crop of grain and grass.

Since malice in fact is rarely, if ever, proved by the express declarations of the defendant to that effect, and since it may be, and is, proved by evidence of the surrounding circumstances, the jury was clearly entitled to find that such malice existed and that the plaintiffs were, as a result, entitled to punitive damages. The record shows not only these facts, but that there had been ill feeling between these parties over the same land in the past. On the trial, the defendant denied that he knew to whom the land was leased, but since the credibility of the witness is for the jury, it is surely permissible to draw an inference from the verdict that he was not believed.

The rule is well settled that where a trespass is committed from wanton or malicious motives, or a reckless disregard of the rights of others, or under circumstances of great hardship and oppression, the measure and amount of damages are matters for the jury alone. (*Russell* v. *Dennison,* 45 Cal. 337.)

The majority say that the defendant could not have been guilty of malice because he made a full disclosure of the facts to his attorney and was advised that under those circumstances he had a legal and enforceable lease. The attorney, whose advice is in question, was the defendant's attorney at the trial of this case. He was not a witness. In his questioning of the defendant, he asked him whether he had told him the same facts as to which he had testified, and then asked him whether or not such advice had been given. At the time the advice was solicited, the defendant knew that he did not have a lease; he knew that the owners' signatures were necessary and had not been obtained; and he also knew that the land had been leased to someone else. These facts show his lack of good faith. In order for the advice of an attorney to be a defense to an action for punitive damages, it must be shown that there was a complete disclosure of all the facts to the attorney, that such advice was sought in good faith, and that the attorney's advice was followed. The defendant's subsequent conduct also tends to show that he was trying to take the law into his own hands in that, even after the trial of the case wherein judgment was rendered against him, and it was determined that he did not have a good or enforceable lease of any kind, he admitted that he still endeavored to go on the land and continue his farming operations.

The decision of the court in this case holding that exemplary or punitive damages are not allowable under the facts in this case is not only erroneous as a matter of law but is mani-

festly unjust and unfair to the plaintiffs. Instead of following the usual practice, and reversing the judgment so as to permit the plaintiffs to retry the case and present further and additional evidence which would amply sustain an award of punitive damages even in the light of the strained construction placed upon the statute by the majority decision, the majority have seen fit, without citation of authority, and contrary to the settled rule and practice of this court, to modify the judgment by eliminating therefrom the award of punitive damages, and then affirming the judgment, so that the respondents who prevailed in the trial court will have no further opportunity to present to another court or jury their claim for punitive damages. I am convinced that this court has no such lawful power, and in taking this action, this court is itself violating the settled law of this state.

It may be true that the majority of this court is out of harmony with the statutes of this state permitting and authorizing an award of exemplary damages in a proper case, but this court did not enact such statutes, and this court has no power to declare the public policy of this state so far as the allowance of exemplary damages is concerned. This is a matter exclusively for the Legislature. By the unwarranted action of this court in striking down the award of exemplary damages in this case, this court has in effect nullified and abrogated a statute which permits an award of exemplary damages.

The statement in the majority opinion that the evidence is insufficient to justify an award of exemplary damages is perfectly absurd. The facts upon which this award is based are set forth both in the majority opinion and in this dissenting opinion, and I do not believe that any unbiased, unprejudiced mind could examine these facts and arrive at an honest conclusion that the defendant Hathaway did not act wilfully and maliciously in destroying the hay and grain growing on the land which had been leased by plaintiffs. In holding to the contrary, the majority of this court is making a mockery out of the rule that conflicts in the evidence are to be resolved by the trier of fact and that an appellate court will not disturb a finding of the jury or trial court based upon inferences which can be reasonably drawn from the testimony of witnesses. To demonstrate the absurdity of the majority holding in this case I desire to call attention to statements appearing in the opinion of this court in the case of *Nichols* v. *Mitchell, ante,* p. 598 [197 P.2d 550] L. A. 19962, filed September 23,

1948. This opinion was prepared by the author of the opinion in the case at bar and contains the following statements with respect to the power of the trier of fact. This same author said in the Nichols case: "This province of the trial court to resolve 'conflicting evidence or conflicting inferences' and to reach a conclusion that will not be disturbed 'on appeal if some substantial evidence or reasonable inference' lends support thereto (*Security-First National Bank* v. *Bruder*, 44 Cal. App.2d 767, 772 [113 P.2d 3]) was forcefully declared in the recent case of *Hicks* v. *Reis*, 21 Cal.2d 654, at pages 659-660 [134 P.2d 788] : '*The trier of the facts is the exclusive judge of the credibility of the witnesses.* (§ 1847, Code Civ. Proc.) While this same section declares that a witness is presumed to speak the truth, it also declares that "This presumption, however, may be repelled by the manner in which he testifies, by the character of his testimony . . . or his motives, or by contradictory evidence." In addition, in passing on credibility, the trier of the facts is entitled to take into consideration the interest of the witness in the result of the case. (Citing authority.) *Provided the trier of the facts does not act arbitrarily, he may reject in toto the testimony of a witness, even though the witness is uncontradicted.* (Citing cases.) . . . [As] the court, in *Market Street Ry. Co.* v. *George*, 116 Cal. App. 572, 576 [3 P.2d 41], stated: "It has always been the rule that courts and juries are not bound by mere swearing no matter how positive, unless it be credible swearing. It may bear within itself the seeds of its own destruction, as where it is inherently improbable, or its destruction may be wrought from without, as where the person swearing is in some manner impeached. In either case court and jury are entitled to disbelieve the testimony if they choose, and if they do refuse it credence it is of no more effect than if it had not been given. It disappears from the case and the inference opposed to it is no longer contradicted." ' " We do not find any of the reasoning contained in the foregoing excerpt from the Nichols case applied in the majority opinion in the case at bar. The reason, of course, is obvious. Because in the case at bar the majority of this court has usurped the functions of the jury and trial court and overthrown a solemn judgment supported by ample evidence without regard to the settled principles of law contained in the above quoted excerpt. In other words, the majority of this court has just strong-armed the record in this case to arrive at a conclusion satisfactory to their concept

of what the law should be with respect to punitive damages, and this is all that can be said in favor of the majority decision on this proposition.

The evidence clearly supports the determination of the jury that the plaintiffs are entitled to punitive damages, and the judgment should therefore be affirmed *in toto*.

Schauer, J., concurred.